EL PUEBLO, DEMANDANTE Y APELADO, *v.* DÍAZ ET AL., ACUSADOS Y APELANTES.

## APELACIÓN procedente de la Corte de Distrito de Guayama en un caso sobre conspiración.

No. 625.—Resuelto en marzo 27, 1915.[1]

SOBRESEIMIENTO—JUICIO—JUSTA CAUSA O EXCUSA.—Los 120 días dentro de los cuales debe celebrarse el juicio en causas criminales se cuentan desde que la acusación es presentada, pero el tiempo que se consuma en mociones dilatorias y en su resolución es una buena causa de excusa para justificar la demora y no sobreseer la causa.

PRUEBAS—AFFIDAVITS PARA SOSTENER UNA MOCIÓN—CONTRA-AFFIDAVITS.—Una declaración jurada (*affidavit*) respecto a materia consignada en procedimientos, es admisible para sostener una moción porque no priva a la parte contraria de presentar contra-declaraciones juradas (contra-*affidavits*) para rebatir aquélla.

CONSPIRACIÓN—CONFUSIÓN DE UN DELITO MENOR EN UNO MAYOR (MERGER).— La doctrina que declara que una acusación que imputa el delito de conspiración para cometer un delito grave y al mismo tiempo la comisión de éste sólo imputa el delito grave, porque el de conspiración, por ser menos grave, ha desaparecido en el delito mayor, no es seguida por la casi totalidad de los tribunales ni por los tratadistas, y aun ha habido tribunal que la ha abandonado.

ID.—FALSIFICACIÓN DE PRUEBAS—"MERGER."—El delito menos grave de conspiración para cometer un crimen, comprendido en el artículo 62 del Código

---

[1] En abril 14, 1915, denegada la reconsideración.

Penal, no se esfuma (*merge*) en el delito grave de falsificación de pruebas, definido y castigado en el artículo 128 del mismo Código, por el hecho de que el objeto de la conspiración se haya realizado, porque dicho artículo 62 sólo se refiere al acto de la conspiración, independientemente de si el objeto de la misma se llevó a término o no; son actos distintos el de la conspiración y el de la ejecución del crimen que fué objeto de ella.

DUDA AL RESOLVER—RESOLUCIÓN AJUSTADA A DERECHO—FUNDAMENTOS ERRÓNEOS—APELACIÓN.—No es motivo para revocar una resolución, el hecho de que al dictarla manifieste el juez que tiene dudas respecto de ella, como tampoco si sus fundamentos son o nó ciertos, si en verdad resolvió de acuerdo con la ley, puesto que lo que se examina en la apelación es si la resolución está o nó ajustada a derecho y no si sus fundamentos son o nó ciertos, no siendo de aplicación en esos casos el precepto legal de que cuando exista duda debe ser resuelta en favor del acusado.

CONSPIRACIÓN—MISDEMEANOR—JUICIO POR JURADO.—Cuándo el delito imputado en la acusación es el menos grave de conspiración, no procede el juicio por jurado, porque ese derecho no se concede en los delitos menos graves.

ID.—DECLARACIÓN DE UN CO-CONSPIRADOR ANTES DE QUE SE PRUEBE EL HECHO DE LA CONSPIRACIÓN.—DISCRECIÓN JUDICIAL.—Si bien es cierto que, por regla general, antes de que se permita a un co-conspirador que declare sobre actos y conversaciones de sus co-conspiradores, se exige prueba independiente de la comisión del delito de conspiración, esta regla no es tan absoluta que no pueda alterarse, y la corte puede, por tanto, en el uso de su facultad discrecional en el orden de las pruebas, con mayor razón cuando el juicio se celebra sin jurado, admitir la declaración de un co-conspirador bajo la condicción de que se pruebe independientemente de ella el hecho de la conspiración.

ADMISIÓN DE PRUEBAS—JUICIO POR LA CORTE.—Cuando el juicio se celebra ante la corte, sin jurado, se permite mayor liberalidad en la admisión de pruebas, porque los jueces pueden sustraerse más fácilmente que los jurados a la admisión de pruebas indebidas.

TESTIGOS—DOCUMENTOS.—Es permitido refrescar la memoria de los testigos por medio de documentos.

PRUEBA DIRECTA—CORPUS DELICTI—MANIFESTACIONES ENTRE CO-CONSPIRADORES.— Constituye evidencia directa del *corpus delicti* en un proceso de conspiración, la declaración de un testigo refiriéndose a conversaciones o manifestaciones entre los co-conspiradores, siempre que sea pertinente a la cuestión que se ventila.

PRUEBAS—FORMA EN QUE SE OBTUVIERON—OBJECIONES A SU ADMISIÓN—LEY NOTARIAL.—El hecho de que una escritura notarial no se presente a la corte en la forma en que previene la ley notarial, no le quita validez ni autenticidad alguna, ni es motivo de objeción para su admisión como prueba.

CONSPIRACIÓN—MANIFESTACIONES DE UN CONSPIRADOR DESPUÉS DE REALIZADO EL OBJETO DE LA CONSPIRACIÓN.—Las manifestaciones hechas por un co-conspirador, después de realizado el objeto de la conspiración, perjudican solamente al que las hace y no a los demás, por lo que son admisibles únicamente respecto a él.

INVESTIGACIÓN FISCAL—DECLARACIONES CONTRADICTORIAS.—No pueden pedirse declaraciones a un Fiscal para buscar en ellas contradicciones o divergencias con lo que se ha declarado en el juicio, y, para que en cualquier caso pueda mostrarse a un testigo una declaración suya anterior, es preciso que primero

se le hagan presentes las contradicciones, si es que existieran, a fin de que pueda explicarlas antes de presentarse prueba alguna escrita en que se contengan.·

CONSPIRACIÓN—EXAMEN DE LAS PRUEBAS—CÓMPLICE—CORROBORACIÓN.—Examinada la prueba en este caso *se resolvió:* que, por el conjunto de toda ella, los apelantes tomaron participación directa en la conspiración, y que la declaración del cómplice fué suficientemente corroborada.

ID.—CÓMPLICE—CORROBORACIÓN.—Las declaraciones de los cómplices deben ser corroboradas de acuerdo con el artículo 253 del Código de Enjuiciamiento Criminal, y cuando se sostiene que la declaración de un cómplice no ha sido corroborada, la corte debe expresar cómo lo ha sido, si es que tal corroboración existe.

ID.—PRUEBA DIRECTA—PRUEBA CIRCUNSTANCIAL.—La confabulación, por parte de los acusados, casi siempre se hace necesario probarla por evidencia circunstancial, dado que la naturaleza del delito hace generalmente imposible que se justifiquen por prueba directa las entrevistas y convenios de los conspiradores.

ID.—PRUEBAS.—En un caso de conspiración debe tenerse en cuenta la participación que cada acusado haya tomado en la realización de la conspiración, así como todos los actos por cada uno de ellos verificados, para poder llegar a la conclusión de si todos son autores de la conspiración; y si se prueba que los acusados por sus actos persiguen el mismo objeto, por los mismos medios, ejecutando unos una parte y otra parte otros, el delito queda justificado, como ha ocurrido en el caso de autos.

PRUEBA CONTRADICTORIA—APRECIACIÓN DE LAS PRUEBAS—PASIÓN, PREJUICIO O MANIFIESTO ERROR.—En los casos de prueba contradictoria este tribunal no intervendrá en la apreciación que de la misma haya hecho el tribunal sentenciador, a menos que se demuestre que, al apreciarla, obró influído por pasión, prejuicio o manifiesto error.

ACUSACIÓN—DUPLICIDAD—CARGOS DISTINTOS.—Cuando una acusación comprende distintos cargos o maneras de realizar el delito, la alegación suficiente de cualquiera de ellos y su prueba justifican una condena.

Los hechos están expresados en la opinión

Abogado del Pueblo: Sr. *Charles E. Foote,* Fiscal.

Abogado de los apelantes: Sres. · *Martín Travieso, Jr., Luis Samalea Iglesias, Manuel F. Rossy* y *Nemesio R. Canales.*

EL JUEZ ASOCIADO SR. ALDREY, emitió la opinión del tribunal.

Este caso se inició con una acusación jurada que presentó el Fiscal en la Corte de Distrito de Guayama el 19 de abril de 1911 imputando a Pedro G. Goyco, Luis Abella Blanco, Pastor Díaz Molinaris y a José C. Ramos, el delito de conspiración, y por sentencia que se dictó por dicha corte de distrito en 28 de diciembre de 1912 fueron declarados culpables

los tres primeros, condenados a sufrir la pena de un año de cárcel con trabajos forzados debiendo pagar cada uno la tercera parte de las costas, y se declaró no culpable y absuelto al otro acusado José C. Ramos.

Los tres sentenciados interpusieron el presente recurso de apelación: Goyco y Díaz presentaron extensos alegatos que sustancialmente convienen en las cuestiones que someten a nuestra consideración por lo que seguiremos al examinarlas el orden fijado en el alegato de Díaz, sin perjuicio de examinar también las tres cuestiones distintas que propone Goyco; Abella Blanco, quien no presentó alegato, nos sometió en el momento de la vista un memorándum de autoridades respecto de una de las cuestiones propuestas por Díaz y éste adicionó el suyo con nuevas argumentaciones. En la vista de la apelación todos los apelantes estuvieron representados por abogados, quienes, así como el Hon. Fiscal de este tribunal, informaron extensamente.

El primer motivo de error que se aduce es el siguiente:

"Al declarar sin lugar la moción de sobreseimiento presentada por los acusados, basada en que habían transcurrido más de 120 días desde que se presentó la acusación sin que se hubiese celebrado el juicio ni que éste hubiera sido transferido a petición del apelante ni de ninguno de los acusados."

De la transcripción de autos aparece que en los primeros días del mes de septiembre de 1911 todos los acusados presentaron moción en este caso solicitando el sobrescimiento de la acción de acuerdo con los artículos 11 y 448, número 2º. del Código de Enjuiciamiento Criminal, fundados en que habían transcurrido más de 120 días desde que la acusación había sido presentada sin que el juicio se hubiera celebrado, ni ellos hubieran pedido su suspensión. A la moción se opuso el Fiscal, la corte la desestimó, y los apelantes tomaron excepción de esa resolución.

La impugnación del Fiscal a la moción se basó en dos fundamentos, que, alterando nosotros el orden en que se adu-

jeron, son: que el término de 120 días a que se refiere el artículo 448, número 2º., del Código de Enjuiciamiento Criminal, no había transcurrido cuando los acusados presentaron su moción de sobreseimiento; y que El Pueblo había tenido una justa causa para no celebrar el juicio dentro de los 120 días.

Desde luego que estos dos motivos de impugnación resultan contradictorios porque si no habían transcurrido los 120 días que la ley fija para celebrarse el juicio no había necesidad de demostrar justa causa por su demora, pero de todos modos lo consideraremos separadamente.

Los artículos en que los peticionarios se fundaron para su moción, dicen así:

"Artículo 11.—En un proceso criminal el acusado tiene derecho a
"1. Un juicio rápido y público.

*           *           *           *           *           *           *

"Artículo 448.—A menos que exista justa causa contraria, el tribunal decretará el sobreseimiento del proceso en los casos siguientes:
"1. *    *    *
"2. Cuando un acusado cuyo juicio no haya sido transférido a petición suya, no sea sometido a juicio en el término de ciento veinte días, a contar desde la presentación de la acusación."

En verdad, que desde el 19 de abril en que la acusación fué presentada hasta el 5 de septiembre en que se formularon las mociones de sobreseimiento, habían transcurrido con exceso los ciento veinte días a que se refiere la ley, y si el Fiscal en la corte inferior y el de este Tribunal Supremo en su alegato sostienen que dicho término no transcurrió, es porque entienden que los ciento veinte días deben contarse desde que fueron resueltas todas las mociones de los acusados, y quedó el caso en condiciones de poder celebrarse el juicio, citando en su apoyo la opinión concurrente emitida por el Juez Harrison en el caso de *People* v. *Buckley,* 116 Cal., 153. Sin embargo, no entendemos que dicho juez dijo lo que se le atribuye por los Fiscales. Dicho juez reseña

todos los actos y mociones ocurridos en el proceso hasta que éstas fueron resueltas y sostiene que cualquier tiempo que se haya consumido por los acusados en mociones dilatorias o alegaciones que tengan por objeto prorrogar el tiempo dentro del cual debían ser llevados al juicio, era una buena causa de excusa para que no se sobreseyera. No dijo que desde que el juicio estuviera en condiciones de celebrarse debía contarse el término sino que él estimaba eso como una justa causa para la demora. De todos modos no estaríamos dispuestos a contar el término sino como la ley lo dispone, esto es, desde que la acusación fué presentada, por lo que llegamos a la conclusión de que los ciento veinte días que nuestra ley concede para celebrar el juicio, habían transcurrido cuando los acusados presentaron sus mociones de sobreseimiento.

Ahora bien, aun cuando la ley impone al juez el deber de sobreseer cuando ese término transcurre sin haberse celebrado el juicio, sin que haya sido suspendido a petición de los acusados, sin embargo le faculta para no sobreseer el proceso cuando existe justa causa contraria, o sea cuando la demora tiene alguna excusa justa, por lo que queda a resolver el segundo motivo de la impugnación del Fiscal de si en el caso presente el Fiscal justificó tal excusa; y como hemos resuelto en varios casos, entre otros los de *El Pueblo* v. *Falcastro,* 17 D. P. R., 96; *El Pueblo* v. *Ayala,* 19 D. P. R., 937, y casos en éste citados, que el juez tiene facultad discrecional para apreciarla, habiendo resuelto el juez del tribunal inferior en el presente caso que existe tal justa causa para la demora, y por tanto para no sobreseer el procedimiento, la cuestión ahora a resolver es si se nos ha demostrado un abuso por el juez de esa facultad discrecional.

Para probar el Fiscal de la corte de distrito la impugnación que hizo a la moción de los peticionarios por el fundamento de que había justa causa para la demora y por tanto para que no se sobreseyera el proceso, el Hon. José R. Aponte, Fiscal que había sido nombrado especialmente

para este proceso, presentó una declaración jurada (*affidavit*) suscrita por él y también la declaración oral del Secretario de la Corte de Distrito de Guayama.   Tanto la declaración jurada del Fiscal (*affidavit*) como la declaración jurada del secretario abarcan un gran número de particulares por lo que para la mejor comprensión de las excusas presentadas nos limitaremos a reseñarlas someramente.

De la declaración del Fiscal (*affidavit*) y de la del secretario resulta que la acusación fué presentada en la corte el día 19 de abril de 1911; que los acusados Pastor Díaz y Pedro G. Goyco, en 2 de mayo siguiente, presentaron moción solicitando juicio por jurado y el acusado José C. Ramos en igual fecha solicitó la separación de juicio y por su parte Luis Abella presentó moción alegando que la corte no tenía jurisdicción sobre su persona, ni por la índole del delito imputado; que en 4 de mayo siguiente, el Juez Harry P. Leake, de la Corte de Distrito de Guayama, se inhibió del conocimiento de la causa remitiéndola a la Corte de Distrito de Ponce de donde era Juez el Hon. Charles E. Foote quien, en primero de mayo, fué nombrado Juez Especial de la Corte de Distrito de Mayagüez donde actuó durante los meses de mayo y junio resolviendo todos los asuntos que estaban pendientes en aquella corte; que en 1º de julio fué también nombrado el Juez Foote, Juez de la Sección 2ª. de la Corte de Distrito de San Juan en donde por el excesivo trabajo de la misma estuvo ocupado con causas aglomeradas y llamó a un término especial; que en 16 de mayo el Juez de la Corte de Ponce resolvió la moción de Ramos solicitando separación de juicio y que si bien en 15 y 16 de junio los acusados prestaron su consentimiento escrito ante la Corte de Distrito de Ponce para que conociera de la causa, en 30 de junio, Luis Abella pidió permiso para retirar su consentimiento por el traslado de Guayama a Ponce y solicitó que la causa fuese devuelta a dicha Corte de Distrito de Guayama, moción que fué concedida en el mismo día por el Juez de la Corte de distrito de Ponce; que las vacaciones de la Corte de Dis-

trito de Ponce fueron durante los meses de mayo y junio; que el 17 de mayo de 1911 empezó la Corte de Distrito de Guayama el pleito electoral seguido por Genaro Cautiño y otros contra José Muñoz Vázquez y otros, que duró hasta el 30 de junio, en cuyo día se convocó a un término especial para seguir conociendo del mismo, cuya vista se reanudó el 17 de julio hasta el 30 de agosto en que fué fallado; que durante todo ese tiempo el Juez Leake de la expresada corte estuvo dedicado casi exclusivamente a dicho pleito y si bien oyó algunas otras causas durante ese tiempo fueron sencillamente presentaciones de acusaciones, sus lecturas, un juicio de divorcio, y una comparecencia en un desahucio, y que desde el 4 de agosto hasta el 30 de ese mes en que la corte se declaró en receso, su juez estuvo ocupado en estudiar el pleito electoral para fallarlo, como lo hizo, en 30 de agosto; que los acusados Ramos y Abella, en su carácter de abogados, estuvieron ocupados en el referido pleito electoral y que el Fiscal Aponte, nombrado para este caso, también estuvo ocupado en la Corte de Distrito de Arecibo desde el 12 hasta el 30 de junio celebrando el juicio en el caso de *Rubert Hermanos* v. *El Pueblo de Puerto Rico* y también en asuntos criminales, en cuyo pleito también estuvo ocupado el abogado J. Henri Brown que lo era de uno de los abogados en este proceso.

Uno de los acusados, el Señor Ramos, presentó prueba en contra de la aducida por el Fiscal, la que en conjunto demuestra que los acusados nunca pidieron la suspensión del juicio y que él por su parte hizo diversas gestiones en los primeros tiempos del proceso para conseguir un juicio rápido.

De la exposición del caso contenida en la transcripción de autos aparece que el Juez Charles E. Foote fué nombrado por el Gobernador, juez especial para este proceso.

Si bien entendemos con los apelantes que no es excusa el que dos de ellos estuvieran ocupados en el juicio electo-

ral, sin embargo, puede estimarse como una consideración que para ellos tuvo El Pueblo de no llevarlos a un juicio criminal cuando ellos estaban ocupados como abogados en un proceso electoral, aunque en unión de otros abogados, que a juzgar por el tiempo que ocupó la atención de la corte debió ser importante. Pero de todos modos, tomados en conjunto los motivos de excusa presentados por El Pueblo, no podemos llegar a la conclusión de que el juez de la corte inferior abusara de su discreción al estimarla justificada por la demora en celebrarse el juicio y al desestimar por tanto la moción de los apelantes. Las ocupaciones demostradas de la Corte de Distrito de Guayama, del juez especial nom- brado para el caso Señor Foote, en Mayagüez y en San Juan y del Fiscal nombrado también para llevar la acusación en este juicio son motivos bastantes para concluir que El Pue- blo tuvo disculpa en no celebrar el juicio dentro de los ciento veinte días siguientes a la presentación de la acusación y que la demora no fué completamente arbitraria y caprichosa, por lo que no es sostenible el primer motivo en que se funda el recurso.

El apelante Abella sostiene además que la corte inferior cometió error al admitir como prueba de impugnación del Fiscal a la moción de sobreseimiento, la declaración jurada de éste (*affidavit*) porque contiene materias que deben pro- barse con los procedimientos a que se refiere y que así se les privó del derecho de repreguntarle acerca de todos y cada uno de los hechos por él jurados. Sin embargo, no creemos que exista tal error porque la mejor manera de pro- bar las mociones o las impugnaciones a ellas es por medio de declaración jurada (*affidavit*), y el hecho de que la que presentó el Fiscal en este caso se refiere a constancias obran- tes en procedimientos judiciales no privaba a los acusados de su derecho para presentar contra declaraciones juradas para rebatir aquella declaración.

El segundo motivo de error alegado por los apelantes es el siguiente:

"Al declarar sin lugar la excepción perentoria de los acusados basada en·que de la misma acusación aparece que la conspiración quedó confundida (*merged*) con un delito de fraude (*felony*), el previsto y penado en el artículo 128 del Código Penal y para cometer el cual la conspiración alegada fué simplemente un medio."

La acusación imputó sustancialmente a los apelantes que teniendo Josefa Rivera en tramitación en el Tribunal de Distrito de Guayama dos pleitos contra Pastor Díaz reclamándole indemnización, uno por incumplimiento de promesa de matrimonio y otro por seducción se confabularon y pusieron de acuerdo para conseguir que Josefa Rivera firmara dos mociones de desistimiento de esos pleitos para presentarlas al tribunal haciéndole creer que los pleitos habían sido transados y que la demandante estaba conforme en terminarlos; que las mociones fueron firmadas y presentadas al tribunal, habiendo obtenido su firma mediante el engaño de que una escritura que la hicieron firmar prevaliéndose de su menor edad y de su ignorancia, pues no sabe leer aunque sí firmar, era el reconocimiento que hacía Pastor Díaz de ser hijo suyo el hijo tenido por Josefa Rivera, cuando en verdad en dicha escritura dicha Josefa Rivera reconocía con Ramón Jiménez que habían procreado dicho niño, siendo así que nunca había tenido relaciones de ninguna clase con Jiménez, escritura que tenía por objeto no sólo pervertir la justicia pública con las referidas mociones sino también privar para siempre al hijo de Josefa Rivera de su derecho de acción para establecer su estado y condición civil como hijo natural de Pastor Díaz y obtener también inmunidad por siempre para éste en cuanto a su propiedad respecto a reclamaciones que pudieran hacerle Josefa Rivera ·y su hijo Ramón.

Para sostener el motivo de error de que tratamos sostienen los apelantes que cuando la conspiración tiene·por objeto la comisión de un delito grave y de la acusación apa-

rece que el delito llegó a cometerse, entonces el delito de conspiración por ser menos grave desaparece en el delito mayor quedando solamente el delito grave para el cual se conspiró, y por el cual debe ser juzgado el acusado; alegación que encuentran justificada en el artículo 62 del Código Penal que define la conspiración como la confabulación de dos o más personas para cometer un crimen o algunos de los actos en él especificados, conspiración que, según los apelantes, sólo se castiga en tanto en cuanto el crimen no se haya consumado.

El fin que persigue la excepción a la acusación es que declarándose por el tribunal que el objeto de la conspiración se había realizado la acusación no imputa otro delito que el grave de falsificación de pruebas definido y penado en el artículo 128 del Código y que por éste únicamente podían ser perseguidos por haberse esfumado en él el de conspiración. En otras palabras, que no se les acuse de un delito menos grave sino de delito grave.

No encontramos fundamento alguno en la ley para sostener, como pretenden los apelantes que hagamos, que del artículo 62 del Código Penal se desprende que el delito de conspiración sólo puede castigarse en tanto en cuanto el crimen objeto de la conspiración no se haya cometido. Ese precepto legal no contiene palabra ni concepto alguno que justifique esa conclusión pues sus palabras no tienen otro alcance que determinar los actos que pueden ser castigados como conspiración. Las palabras de la ley según las cuales existe el delito de conspiración cuando dos o más personas conspiraren para cometer un crimen o cualquiera de los actos en él expresados no quieren decir que solamente puede perseguirse ese delito cuando el objeto de la conspiración no se ha realizado. Conspirar para cometer un crimen no quiere decir conspirar para cometer un crimen y no ejecutarlo. Ese artículo sólo se refiere al acto de la conspiración independientemente de si el objeto de la conspiración se llevó a término o no. Son en verdad actos distintos los de la conspi-

ración y los de ejecución del crimen objeto de la conspiración.

Pero donde los apelantes fundan principalmente su alegación es en las decisiones de algunos tribunales y al efecto citan las dictadas en el caso de *People* v. *Eagan,* 116 Cal., 287; *Hoyt* v. *State,* 16 L. R. A., 239, y *United States* v. *Gardner,* 42 Fed. Rep., 829; citas que se encuentran en 6 American and English Encyclopædia of Law, página 863; (2ª. ed.).

A pesar de que esas decisiones declaran que la acusación que imputa el delito de conspiración para cometer un delito grave y al mismo tiempo la ejecución de éste sólo imputa el delito grave porque el de conspiración por ser menos grave ha desaparecido en el delito mayor, sin embargo esa doctrina no es seguida por la casi totalidad de los tribunales, ni por los tratadistas y aun ha habido tribunal que la ha abandonado. Así vemos, que el de Massachusetts que la reconoció mediante *obiter dictum* en el caso de *Commonwealth* v. *Kingsbury,* 5 Mass., 106, no la sigue en el de *Commonwealth* v. *Warren,* 6 Mass., 74, ni en el de *Commonwealth* v. *Walker,* 108 Mass., 309, en cuyo caso dijo el tribunal lo siguiente:

"No existe verdadero fundamento para sostener que la moción para anular el veredicto por el fundamento de la ejecución del plan de los conspiradores constituía un delito grave y confundió el delito menos grave de conspiración. El hecho de que el acusado haya sido culpable de un delito mayor que el de que se le acusa no constituye defensa."

Igual declaración se hace en *Commonwealth* v. *Stuard,* 20 Mass., 571, fallado en 1911. Tampoco se acepta la doctrina de la confusión de un delito menor en otro mayor en Connecticut, New Hampshire, Texas, según la nota 76 contenida en 8 Cyc., 664, y demás citas que contiene.

En el caso de *Wait et al.* v. *State,* 15 Am. Criminal Reports, 79, el tribunal de apelaciones de Kentucky estudia esa cuestión y después de considerar el caso de *Commonwealth* v. *Blackburn,* 1 Duv., 4, el de *Commonwealth* v. *Kingsbury* (*supra*) y el de *Elsey* v. *State,* 47 Ark., 572, llega a la con-

clusión de que el acusado fué propiamente convicto del delito de conspiración para defraudar bajo una acusación que le imputó ese delito, aunque éste sea menos grave y los actos alegados muestren en ella que los que realizó como consecuencia de la conspiración son constitutivos de delito grave.

Aun cuando el caso que acabamos de citar es muy interesante todavía lo es más el de *State* v. *Effler,* decidido en noviembre de 1910, inserto en 78 Atlantic Reporter, 413, y en el cual los acusados hicieron igual alegación y adujeron las mismas citas que los apelantes en este recurso. En él, después de considerar las decisiones en pro y en contra de esa teoría, se llega a esta conclusión:

"Creemos que el peso decisivo de las decisiones recientes, así como las razones en ellas consignadas son contrarios a la alegación del acusado."

También los tratadistas más conocidos de Derecho Criminal son contrarios a la doctrina que sustentan los apelantes. Véase el párrafo 1609 de "Wharton Criminal Law," tomo 2°., edición undécima.

En la sección 814 del Tomo I de "Bishop's New Criminal Law," se dice lo siguiente:

"Una conspiración para cometer un delito grave es un paso hacia la consumación de éste, pero es solamente un delito menos grave. Hay decisiones americanas que parecen sostener que si en tal juicio por conspiración se demuestra que como consecuencia de ella las partes realizaron un delito grave, el delito menos grave desaparece, y no pueden ser condenadas; regla que, de acuerdo con las autoridades, no es aplicable cuando el objeto de la conspiración es un delito menos grave. Esta doctrina * * * es contraria a justo principio; ha sido rechazada en Inglaterra; y aunque puede haber Estados en los cuales es sostenida, no parece ser la ley general americana."

En vista de lo que dejamos expuesto llegamos a la conclusión de que el delito menos grave de conspiración no se esfuma en el delito grave consumado que fué objeto de ella y que no cometió el tribunal inferior el error que se alega en el segundo motivo del recurso.

El tercer error que se alega dice así:

"Al declarar culpables a los acusados, de un delito de conspiración, no obstante haber manifestado, al resolver la excepción perentoria mencionada en el error anterior *que tenía dudas* sobre si procedía o no procedía la excepción de los acusados basada en la confusión (*merge*) del delito de conspiración con el delito de *felony* previsto y penado en el artículo 128 del Código Penal."

No es motivo para revocar una resolución que al dictarla manifieste el juez que tiene dudas respecto de ella, como tampoco si sus fundamentos son o nó acertados, si en verdad resolvió de acuerdo con la ley. Cuando resolvemos una apelación lo que examinamos es si la resolución está o nó ajustada a derecho y no si sus fundamentos son o nó ciertos. En cuanto a las citas que los apelantes hacen en apoyo de este motivo de su recurso referentes a que cuando existe duda fundada en cuanto a si el hecho imputado cae dentro de la prescripción penal tal duda debe ser resuelta en favor del acusado, no son aplicables a este caso porque nosotros no tenemos duda de que el tribunal inferior resolvió acertadamente la excepción de los apelantes pues la acusación imputó solamente el delito menos grave de conspiración.

Como cuarto error se alega el siguiente:

"Al negar a los acusados el derecho solicitado por ellos, a ser juzgados por un jurado, y al declararles finalmente culpables del delito de conspiración, no obstante imputarse a dichos acusados en la dicha acusación, otro delito; el delito de *felony* previsto y penado en el artículo 128 del Código Penal."

Después de la declaración que hacemos al resolver el segundo motivo de error y toda vez que el delito imputado en la acusación fué el menos grave de conspiración no podemos declarar que el tribunal cometiera error al negar a los apelantes que los juzgara un jurado toda vez que nuestras leyes no conceden ese derecho en los delitos menos graves. Este motivo del recurso no necesita mayor consideración porque descansando en el éxito del segundo error alegado desaparece su base al negarse que exista aquel error.

Como quinto motivo alega que la corte erró:

"(*a*) Al negarse a eliminar la declaración del testigo Manuel M. Sama que no tenía pertinencia alguna."

Este testigo se refiere en su declaración a conversaciones que tuvo con uno de los conspiradores, Ramón Jiménez, respecto a hechos íntimamente relacionados con la conspiración, y además testificó que ese mismo día vió a Goyco, a Pastor Díaz, y a Ramos hablando juntos en el balcón de la casa de éste. La declaración de este testigo tendía, más bien que a imputar a los acusados hecho alguno, a corroborar la declaración de Ramón Jiménez que depuso que había tenido con él una conversación en ese mismo día referente a la firma de la escritura en cuestión, por lo que no podemos ver la impertinencia de esa declaración.

"(*b*) Al permitir que el testigo Ramón Jiménez (*a*) Chivo, co-conspirador, hiciera, contra la objeción de los acusados, la narración de hechos y de conversaciones con el acusado Pastor Díaz, sin que antes se precisara si esas conversaciones tuvieron lugar antes o después de la formación de la conspiración alegada.

"(*c*) Al admitir, contra la objeción de los acusados, y negarse después a eliminar la declaración del dicho co-conspirador llamado el 'Chivo,' sin que antes se trajera prueba independiente que estableciera, aun cuando fuera sólo *prima facie* el hecho de la conspiración."

Dichos errores *b* y *c* envuelven la queja de que se permitió que Ramón Jiménez declarase sin que antes se hubiera presentado prueba independiente de la existencia de la conspiración. Sin embargo, el orden en las pruebas es discrecional en la corte, con mayor razón cuando el juicio se celebra sin jurado como ocurrió en este caso, y si bien es cierto que por regla general antes de que se permita a un co-conspirador que declare sobre actos y conversaciones de sus co-conspiradores se exige prueba independiente de la comisión del delito de conspiración, no es tan absoluta esa regla que el juez no pueda alterarla. El propio caso que en su apoyo citan los apelantes de *El Pueblo* v. *Compton,* 123 Cal., 407,

demuestra que no es un error el permitir algunas veces la declaración del co-conspirador antes de que se haya presentado prueba *prima facie* de la comisión del delito de conspiración, y llega hasta sostener que esa es práctica muy corriente en las cortes y que suele ser permitida, con la condición de que El Pueblo presente dicha prueba. Esto es lo que parece ocurrió en el presente caso, pues al terminar las preguntas directas que se dirigieron a Ramón Jiménez y antes de que se hubiera presentado prueba independiente para demostrar la conspiración, solicitaron los apelantes, según consta en la página 57 de la transcripción, que se eliminase esa declaración porque la corte la admitió bajo la promesa del Fiscal de relacionarla con el delito perseguido, relación que no había sido establecida.

Esto nos demuestra que si el juez admitió la declaración de Ramón Jiménez fué con la citada condición y desestimó propiamente la moción de los apelantes, porque no habiendo sido presentada aún toda la prueba del Fiscal, no podía sostenerse que no había probado independientemente de ella, la comisión del delito. Véase *El Pueblo* v. *Beltrán*, 18 D. P. R., 949, y casos en él citados.

En cuanto al particular de que se permitió declarar al testigo Ramón Jiménez sin que se precisara si sus manifestaciones se referían a actos y conversaciones anteriores o posteriores a la conspiración que se persigue, nos bastaría decir que como dicho testigo se estaba refiriendo en su declaración a actos ocurridos el día en que se firmó por él la escritura de reconocimiento del hijo de Josefa Rivera ante el Notario Abella y esa escritura fué insertada en la acusación y se presentó como prueba en el juicio, por ella se puede determinar que sus manifestaciones y actos hacían referencia al día del otorgamiento.

"(*d*) Al desestimar la objeción de los acusados a que el mismo testigo llamado 'Chivo' refiriese lo que él le dijo al otro testigo Sama y lo que Sama le dijo a él."

En cuanto a haber permitido la Corte que el testigo Ra-
món Jiménez expresara lo que él le dijo a Sama, y no orde-
nara su eliminación ni tampoco de las contestaciones que
Sama le diera, no creemos que la corte cometiera error al-
guno pues Jiménez declaraba en el primer particular res-
pecto a palabras dichas por él y no de otras personas; y
en cuanto a las palabras que a él le dijo Sama, toda vez que
éstas ya habían sido expresadas por el propio Sama, no cree-
mos que pudieran en modo alguno perjudicar los derechos
del apelante.    Además, cuando el juicio se celebra ante la
corte, sin jurado, se permite una mayor liberalidad en la
admisión de pruebas, porque los jueces pueden sustraerse
más fácilmente que los jurados a la impresión de pruebas
indebidas:

"(*e*) Al desestimar la objeción de los acusados en cuanto a la
pregunta sugestiva del Fiscal, calculada para indicarle al dicho tes-
tigo llamado 'Chivo' la fecha en que tuvieron lugar los hechos por
él relatados."

Realmente es imposible sostener que exista el error que
se alega.    El testigo Ramón Jiménez había declarado repe-
tidas veces que se le había llevado para firmar una escritura
de reconocimiento de un hijo de Pastor Díaz; que firmó la
escritura, y si bien no precisaba el día porque decía no recor-
dar la fecha exacta en que ocurrieron los hechos, como quiera
que había reconocido ese documento que tiene fecha, el Fis-
cal lo único que hizo fué manifestarle que el documento tenía
fecha 26 de enero, pregunta que no permitió la corte, aun
cuando consintió que el testigo examinara el documento para
ver si recordaba la fecha, con lo cual no cometió error alguno,
pues es permitido refrescar la memoria de los testigos por
medio de documentos.

"(*f*) Al negar la eliminación de la declaración del testigo Ma-
nuel Díaz Cortada."

Este fundamento de error lo basan los apelantes en que
el testigo no determinó en su declaración la fecha en que

ocurrieron los hechos que relata y porque se refiere a cosas que no tienen pertinencia alguna con el juicio o se refiere a palabra o admisiones de Pastor Díaz que son inadmisibles como hechas por un co-conspirador, mientras no se haya establecido mediante prueba independiente el *corpus delicti.*

En cuanto al primer motivo de objeción si bien es cierto que el testigo no pudo precisar la fecha en que' ocurrieron los hechos que presenció, respecto a los cuales declaraba, sin embargo, aproximadamente la expresó al decir que habían tenido lugar "más allá de un año y pico''; y si bien por su propia declaración no podía concretarse la fecha, sin embargo, relacionada con las demás pruebas podía llegarse a la conclusión de la fecha a que hacía referencia.

En cuanto al segundo motivo de objeción, su declaración era pertinente porque se refería a conversaciones entre Pastor Díaz y Ramón Jiménez, en las que el primero suplicaba al segundo que lo necesitaba para reconocer como suyo un hijo que él había tenido con Josefa Rivera, cuyo servicio ofreció pagarlo, lo cual constituye evidencia directa del *corpus delicti.* De todos modos siempre serían admisiones en contra de Pastor Díaz.

"(*g*) Al admitir como prueba, contra la objeción del acusado Señor Abella, la escritura de reconocimiento que con el número 1, con fecha 26 de enero de 1911, y suscrita por Luis Abella Blanco, presentó el testigo de El Pueblo Enrique S. Mestre, Secretario de la Corte de Distrito de Guayama.''

Bajo este fundamento de error se sostiene que, porque la escritura que Ramón Jiménez y Josefa Rivera otorgaron ante el Notario Abella sobre reconocimiento de hijo, que parece fué ocupada por orden de un juez que luego se declaró no tenía jurisdicción en el asunto, fué presentada por el Secretario Mestre no podía dársele valor alguno ni autenticidad, y que la única manera de presentación era mediante una certificación librada por el notario, de cuyo protocolo forma parte, o por la presentación de la misma, por el propio

notario. La manera cómo el documento se presentara a la corte, no le quita validez ni autenticidad alguna, y el que hubiera sido ocupada por el secretario por orden de un juez que no tenía jurisdicción, no era fundamento para oponerse a su admisión ni para quitarle validez. Dicho documento es el original suscrito por Josefa Rivera y Ramón Jiménez y por el Notario Abella y los testigos y es por tanto un documento enteramente válido. ` Además, el hecho de que no fuera el documento a la corte en la forma en que previene la Ley Notarial, no es motivo de objeción para su admisión como evidencia. Véase el caso de *El Pueblo* v. *Cerecedo*, 21 D. P. R., 66.

"(*h*) Al permitir, contra objeción razonada de los acusados, que el testigo C. Domínguez Rubio declarase las razones que tuvo para intervenir en un pleito distinto de aquellos que se mencionan en la acusación.

"(*i*) Al negarse a eliminar la declaración del mismo testigo, no obstante su absoluta falta de relación o pertinencia con el hecho de la conspiración."

Bajo estas dos letras se trata la declaración que prestó el testigo C. Domínguez Rubio a la cual se opusieron los apelantes y que pidieron fuera eliminada cuando terminó su testimonio. Este testigo se refirió únicamente a que el Juez de la Corte de Distrito de Guayama le nombró defensor *ad litem* de Josefa Rivera para seguir adelante un pleito de filiación contra el Señor Pastor Díaz y que cuando se hizo cargo de la representación de ella y de su hijo, desistió de dos pleitos que había entablado el Señor Abella a nombre de Josefa Rivera contra Pastor Díaz, uno por seducción y el otro por incumplimiento de promesa de matrimonio, los mismos a que se refiere la acusación; y aun cuando realmente esta declaración no guarda relación con los hechos que se investigaban, no vemos tampoco que pudiera causar perjuicio alguno a los acusados, por lo que el error no fué sustancial.

(j) Al permitir, contra objeción razonada de los acusados, que el testigo Francisco Jiménez declarase sobre una conversación habida entre dicho testigo y el acusado y apelante Pastor Díaz, después de realizarse el objeto de la supuesta conspiración.''

La declaración de Francisco Jiménez versó sobre manifestaciones que le hizo Pastor Díaz en una conversación que con él tuvo después que se había otorgado el documento notarial a que hemos hecho referencia y se habían firmado las mociones de desistimiento en los pleitos, por lo que entendemos que perjudica solamente a Pastor Díaz y no a los demás y era por tanto admisible respecto a él. En igual caso se encuentra la declaración de Marcelo Villalí en cuanto a lo que también le manifestó Pastor Díaz y que es uno de los tres motivos particulares de error en el alegato de Goyco.

''(k) Al negarse a eliminar la declaración de Darío Suárez no obstante su absoluta impertinencia.''

El testigo Darío Suárez concretó su declaración a que un día del mes de enero vió a Pedro Goyco, Luis Abella y Agustín Colón que fueron hasta la casa de Josefa Rivera, donde entraron, y unos pocos días después vió que Abella, Goyco y Pastor Díaz salieron de la corte y fueron a un hotel, donde también subió el testigo y oyó cuando Goyco decía a Pastor que debía ir a Ponce a preparar a Ramón Jiménez para que no declarara; y que después, en otras ocasiones, le confesó Goyco que había recibido $80.

Se solicitó la eliminación de esta declaración porque se trataba de actos realizados después de la conspiración, y además, porque no tenía valor en cuanto al delito perseguido. La corte negó la moción y aun cuando ahora se alega que cometió error, entendemos que no infringió la ley porque era admisible con respecto a Pastor Díaz y a Goyco aun cuando fueran posteriores a la conspiración.

El sexto error alegado dice así:

''Al negarse a expedir una orden de *subpœna duces tecum* al Fiscal Sr. Aponte para que compareciera como testigo de los acu-

sados trayendo consigo las declaraciones que el testigo Ramón Jiménez (*a*) 'Chivo' hubiese prestado ante él y estuviesen en su poder.''

En este caso si bien Ramón Jiménez dijo que había prestado declaraciones ante los Señores Foote y Palacios, en Ponce, y también en el cuartel de la policía ante el Fiscal Aponte, aunque no recuerda si las firmó o no, en todo el interrogatorio a este testigo no aparece dato alguno del cual pueda venirse en conocimiento de que él en tales declaraciones hiciera manifestaciones contrarias a las que rindió en la vista de la causa y por tanto no cometió la corte inferior error alguno al negar la moción de los apelantes de que el Fiscal Aponte presentara aquellas declaraciones. No pueden pedirse declaraciones a un Fiscal para buscar en ellas contradicciones o divergencias con lo que se ha declarado en el juicio, y para que en cualquier caso pueda mostrarse a un testigo una declaración suya anterior es preciso que primero se le hagan presentes las contradicciones, si es que existieron, a fin de que pueda explicarlas antes de presentarse prueba alguna escrita en que se contengan.

Los errores 7 y 8 dicen:

''7. Al declarar sin lugar la moción razonada de absolución perentoria que hicieron los acusados al terminar la prueba de El Pueblo, por insuficiencia de dicha prueba.

''8. Al declarar culpable al apelante del delito de conspiración, por la mera declaración de un cómplice no corroborada suficientemente en puntos esenciales.''

Estos dos errores se tratan conjuntamente en el alegato que estamos siguiendo por referirse a la insuficiencia de la prueba de El Pueblo y a la falta de corroboración del cómplice Ramón Jiménez para fundar una sentencia condenatoria por lo que, para considerarlos, es necesario que hagamos un resumen de la prueba de cargo, el cual tomaremos del alegato del Fiscal de este Tribunal Supremo por encontrarla ajustada a las resultancias del proceso tal como aparecen de la exposición del caso.

"MANUEL M. SAMA.—Que el día que se firmó la escritura de reconocimiento vió al 'Chivo' dos o tres veces en la Corte de Guayama adonde había ido a consultarle sobre si podía reconocer al niño Ramón Rivera; que vió en casa de Ramos a Pastor Díaz y a 'Chivo' hablando juntos.

"RAMÓN JIMÉNEZ.—Declaró que fué de Ponce a Guayama llevado por Pastor Díaz y que salieron de Ponce con José Miguel Díaz Cortada (a) Ropero, el cochero, durmiendo en el barrio Jauca y que al día siguiente le dijo Pastor Díaz que lo quería para que le reconociera un niño que había tenido con una sirvienta de la hacienda, y le prometió regalarle un pico, manifestando el testigo que aceptaba si no le pasaba nada; que Pastor Díaz le dijo que no iba a pasarle nada, que le había ganado a esa mujer dos pleitos. Que llegaron a Guayama; que se apeó Pastor Díaz con él en la casa del Ledo. Ramos, que no se hallaba en su bufete, habiéndose ido Pastor Díaz a cambiarse de ropa y él se quedó allí hasta que llegó Ramos, quien le preguntó si era él el joven que le había traído Pastor Díaz de Ponce para el reconocimiento del niño de él, contestándole afirmativamente; que entonces lo invitó a entrar y sentarse, y al poco rato le llamó la atención al Licenciado Ramos, preguntándole si en ese asunto él no se perjudicaba en algo reconociendo al niño, contestándole Ramos que no le pasaría nada, que eso estaba acostumbrado a pasar por allí, que reconocieran hijos por ahí, que la corte no tenía que ver absolutamente nada con eso. Que como a las dos salió del bufete de Ramos y tropezó con Pastor Díaz quien le preguntó si había hablado con Ramos y le dijo fuera al bufete de Abella. Que allí encontró a Abella en compañía de Goyco, y que Abella le dijo: 'Es usted el joven que trajo Pastor Díaz?' y entonces le aconsejó que firmara una cosa y que fuera donde Pastor Díaz para que le diera el dinero y se fuera para Ponce; que no tenía necesidad de ir donde la mujer, porque eso ya estaba arreglado; que no estando conforme se fué donde el Licenciado Ramos a quien le contó lo que le había ocurrido en el bufete de Abella y le dijo que no iba a hacer lo que Abella quería; que Ramos le dijo que estaba bien y que lo aguardase allí; que fué a la corte a ver al Juez Leake y habló allí con Sama y que por consejos de éste volvió a la oficina de Abella y le pidió la copia del asunto ese para llevársela a unos amigos para consultarles; que Abella se resistió a entregarle los papeles, explicándole que eso no era necesario y que él entonces regresó a la corte y llamó otra vez a Sama; que éste le enseñó unos documentos donde Josefa Rivera no sabía firmar; que fué a casa del Licenciado Ramos en donde encontró a los Ledos. Ramos, Abella y Goyco, los que sos-

tenían una discusión sobre que faltaba un testigo; que sobre ese
testigo había la duda de que no podía ser de la confianza de Pastor
Díaz para que viniera a dar una firma; que en eso trajeron al tes-
tigo y salieron todos de allí para la casa de Josefa; que entraron en
ella y Abella le dijo a Josefa: 'Aquí hemos venido para que usted
dé su firma para que Pastor Díaz le reconozca su hijo,' y que ella
dijo: 'Está bien' y firmaron.   Que allí estaban Goyco, Abella, otro
señor más y el que declara; que Abella se puso a leer una cosa y le
dijo a Josefa: 'Firma aquí.'   Que ella llegó y se puso a firmar, pero
en una forma que se veía el acometimiento en la mano de él, como
que quería que firmara; le explicaba las letras poco a poco.   Enton-
ces firmaron Goyco y el otro señor y le dijeron al testigo que fir-
mara; que él contestó: 'Aquí no; en casa de Ramos firmaré.'   Que
fueron a casa de Ramos, de la que salió a todo escape para el hotel y
llamó a Sama; que Sama le aconsejó que firmara; que fué otra vez
al bufete de Ramos y firmó.   Después se fué Pastor Díaz y volvió
trayendo un piquito de dinero; le entregó un dinero y después apa-
reció que faltaba más dinero y entonces Ramos le entregó a Pastor
Díaz un cheque de $25.50; que en eso entonces hubo una discusión
en la que Pastor Díaz exigía que a los documentos le pusieran un
sello y que Abella decía que era imposible porque ya estaba cerrado
y era de noche, y que Ramos se lo decía también.   Que hubo la des-
confianza; que entonces llegaron, y para que se acabara la discu-
sión dice el Licenciado Ramos a la señora que se llama María: 'María,
tráeme la llave de la caja y guarda estos documentos para que se
acabe la discusión.'   Que vino la señora; trajo la llave y guardó
los documentos en la caja.   Que entonces salió con Pastor Díaz, quien
le dijo en la plaza que se encontrara con él por la mañana; que al
día siguiente por la mañana le dijo que no se fuese a Ponce, que se
quedara, que cogiese a su mujer y la conquistara, la llevara a Ponce,
la metiese a prostituta y le quitara el dinero.   Que nunca había
visto a Josefa Rivera antes, y que nunca había tenido contacto car-
nal con ella y que conocía a su hijo Ramón.   Que Pastor Díaz no
fué con ellos a casa de Josefa Rivera el día ese que vinieron de Ponce.

"JOSEFA RIVERA.—Declara que el padre del niño es Pastor Díaz,
que tendrá tres años de nacido y que su nombre es Ramón Pastor;
que presentó un pleito contra el Sr. Pastor Díaz, y que su abogado
era el Señor Abella; que ese pleito era por abandono de menores;
que dió una queja al Juez Leake con respecto a esos pleitos.   Que
Abella fué a su casa y le dijo que tenía que hacer un arreglo, por-
que tenía el asunto perdido, y que ella le dijo que lo hiciera siempre
y cuando Pastor Díaz reconociera al nene y le pasara los alimentos;

le dijo que le iba a dar 450 dollars además como arreglo. Que enton-ces ella lo dijo que si le reconocía al nene y le pasaba los alimentos que aceptaba, que hiciera la clase de arreglo que él quisiera, pero que de lo contrario no, que ella pondría otro abogado y seguiría el asunto. Que Abella le dijo que no tenía más pruebas, y que ella le contestó que las tenía de sobra, diciéndole entonces Abella que Pastor tenía el asunto ganado, a lo que ella le contestó: 'Si tiene el pleito ganado, ¿por qué venir a buscar arreglos?'; que Abella le contestó que él no sabía nada y que tenía que darse prisa antes de que Pastor se enterase de que tenía el asunto ganado, porque si lo llegaba a saber no hacía arreglo. Que entonces ella le dijo que hiciera el reconocimiento del nene y que después de eso podía hacer lo que quisiera; que Abella quedó en que iría a ver si Pastor hacía el reco-nocimiento y le pasaba los alimentos, y que además le ofreció darle cuatrocientos cincuenta pesos. Que Abella salió de la casa prome-tiendo volver luego, que fué con Pedro Goyco, con quien salió de la casa, que al poco rato, como a la media hora se apareció Abella con Goyco y dos más a quienes ella no conocía; que llevaban un docu-mento que me dijeron firmara y que la hicieron firmar; que dió tres firmas; que entonces ella le dijo a Abella: 'Mire Abella, tenga en cuenta que él reconozca al nene,' y que él dijo: 'Sí, y además te dará 450 dollars, y te pasará los alimentos todos los meses, ¿qué más quie-res?' Que ella le dijo: 'Sí, porque si no es así yo sigo el pleito, aun-que lo pierda; yo quiero el reconocimiento de mi hijo primero que nada;' que Abella le dijo: 'Estos que vienen aquí son para hacer constar que Pastor va a reconocer al niño; que los que estaban allí dijeron que era así; que después de hacerla firmar se fueron. Que por la tarde, como entre 5 y 6 ella estaba en el balcón con María Vázquez y un jóven a quien ella no conocía se acercó y le dijo si ella estaba conforme en que él reconociera a su hijo, que fuera el padre de su hijo; que ella le llamó atrevido, diciéndole que ella no lo cono-cía; que el padre de su hijo era Pastor Díaz tan seguro como de que su nombre era Josefá Rivera, y que no se metiera a menos que qui-siera ir a presidio; que él le dijo que ya estaba todo arreglado, que lo único que faltaba era su firma de él y que iba a darla, contestán-dole ella que se atreviese a darla, si quería ir a presidio, llamándole atrevido; que entonces él se fué, y detrás de él se fué ella y María Váz-quez; que llegaron a la oficina del Lcdo. Ramos; que Ramos salió y le preguntó qué le pasaba; ella le contestó que era que Abella había estado en su casa, que tenía un pleito con ella, que le dijo que Pastor Díaz le iba a reconocer el hijo y además le iba a dar todos los meses una renta y 450 pesos, pero que ahora resultaba que habían

traído un hombre a quien ella no conocía para que reconociera a su hijo, y que eso ella no lo permitía; que él le dijo que no podía hacer nada, únicamente le aconsejaba fuera a quejarse al juez, que fuera donde Abella y hablara con él, pues él no quería meterse en nada.   Que ella fué entonces donde el juez y le contó lo que ocurría. Que le habían llevado una cantidad de dinero, pero que ella no quiso admitirla; que se la había llevado Abella Blanco.   Que las personas que fueron a su casa para firmar los documentos fueron Abella, Goyco y dos más a quienes ella no conocía; que le dijeron que las firmas eran para el reconocimiento del nene, y que ella firmó creyendo que era para eso; que conoce a Pedro Goyco; que él fué el que acompañó a Abella a su casa; que primero fueron ellos dos, y después unos cuatro.   Que cuando fueron los dos solos a su casa Goyco le dijo que le convenía hacer el arreglo, porque siguiendo el pleito no sacaba nada, siendo mejor hacer un arreglo; que después fueron Goyco y Abella otra vez a su casa con dos más que ella no conocía; que cuando fueron los dos solos serían como las tres, y que después, como media hora más tarde, llegaron otra vez en número de cuatro.

MIGUEL DÍAZ CORTADA.—Declara que él oyó la conversación entre Pastor Díaz y Ramón Jiménez (a) el Chivo, cuando aquél le dijo a éste que tenía un hijo y que si lo quería reconocer, ofreciéndole el Pastor al Jiménez dinero; que vió cuando Pastor y Jiménez se apearon en el bufete de Ramos; que más tarde fué con Ramón Jiménez a casa de Abella y presenció cuando el Jiménez le pidió a Abella unos papeles.

"IRVING MCMANUS.—Declaró que fué márshal de la Corte de Distrito de Guayama desde el 27 de mayo de 1911 hasta el día 8 de noviembre del mismo año y que recibió una orden del juez de la corte para buscar un documento que tenía el Señor Abella Blanco como notario; que ocupó el documento y lo entregó a la corte, siendo el que se le pone de manifiesto, o sea una escritura otorgada con el número 1 ante el Notario Abella en el cual Ramón Jiménez reconoce como hijo suyo a un niño habido en sus relaciones con Josefa Rivera.

"ENRIQUE S. MESTRE.—Que vió al 'Chivo' ese día hablando en casa de Ramos con el Sr. Pastor Díaz, e identificó la escritura de reconocimiento.   Que cuando Abella presentó las mociones de desistimiento el juez no accedió a ellas y nombró a Domínguez defensor de Josefa Rivera, quien desistió de los dos pleitos ,y presentó otro nuevo sobre filiación.

"C. DOMÍNGUEZ RUBIO.—Que fué nombrado por el Juez Leake defensor *ad litem* de Josefa Rivera para seguir adelante un pleito de filiación contra el Señor Pastor Díaz; que cuando se hizo cargo de la representación de Josefa Rivera y del menor Ramón era el abogado de ella el Señor Abella; que habían dos pleitos entablados contra Pastor Díaz, uno por seducción y el otro por incumplimiento de promesa de matrimonio.

"MARCELO VILLALI.—Declaró que habló con Pastor Díaz en Ponce, y que le dijo que tenía una mujer en Guayama con la que había tenido un chiquillo; que estaba demandado, pero que había arreglado el asunto por $300 con Abella Blanco, y que teniendo necesidad de reconocer al chiquillo en nombre de otro, había llevado a Guayama a Ramón Jiménez para que lo hiciera.

"GERMÁN BANK.—Declara que es oficinista y que es vecino de la 'Central Fortuna'; que en el mes de enero del año pasado, 1911, estaba con el Lcdo. Ramos de escribiente; que un documento que se le presenta (moción de desistimiento en el caso de Josefa Rivera contra Pastor Díaz por seducción) reconoce haberlo hecho él mismo en la oficina de Ramos en maquinilla; que de eso hará dos años; que el mismo día que hizo las mociones estuvo por allí Abella una o dos veces; que el abogado Abella fué a la oficina de Ramos con el acta notarial de reconocimiento de hijo natural de Josefa Rivera con Ramón Jiménez y que allí se rehizo o enmendó parte de dicha escritura; que esta enmienda se hizo por una observación de Ramos a Abella; que Ramos le llamó la atención a Abella acerca de algo de que el testigo no se acuerda; que oyó a Ramos cuando dijo que Enrique Vidal, testigo de la escritura, no prestaba garantías; que la escritura se rehizo con la pluma del testigo; que él le dió la pluma a Abella y éste enmendó en su presencia; que la parte rehecha fué el último pliego de la escritura; que después salió Abella de la oficina; que conoce a Pedro Gerónimo Goyco; que cree que también estuvo en casa de Ramos ese día; que la escritura que se le pone de manifiesto y que reconoce es la de reconocimiento de hijo natural del menor Ramón Rivera. Que no puede decir con seguridad si la escritura que allí se rehizo era la misma que trataba del reconocimiento; que él no leyó dicha escritura; que el documento que allí se rehizo no quedó en manos de Ramos, sino que se lo llevó Abella; que las mociones de desistimiento fueron dictadas por Ramos; que dichas mociones las escribió el testigo por la mañana; que lo de la escritura ocurrió por la tarde, cerca de la hora de cerrarse la oficina; que no fué en casa de Ramos que se firmó la escritura de reco-

nocimiento; que allí no se firmó nada; que el Sr. Goyco acostumbraba ir con frecuencia a la oficina del Sr. Ramos; que el Sr. Abella también solía ir muchísimas veces por allí.

"FRANCISCO JIMÉNEZ.—Declara que Pastor Díaz fué a su casa en Ponce, y le ofreció dinero para que aconsejara a Ramón Jiménez para que declarase que él viajaba a Guayama y que durante sus viajes tuvo relaciones con Josefa Rivera.

"DARÍO SUÁREZ.—Que un día del mes de enero vió a Goyco, Abella y a Agustín Colón que fueron a la casa de Josefa Rivera; que tres o cuatro días después vió a Pastor a Abella y a Goyco, y oyó que Goyco decía a Pastor que lo que tenía que hacer era irse a Ponce y hablar con el 'Chivo' para que no le fueran a dar una sorpresa y para que no fuera a declarar; que días más tarde Goyco le dijo que a él le habían dado ochenta dollars, que él era un agente, un alquilado, que lo habían alquilado y que había trabajado."

Como prueba documental se presentaron las mociones de desistimiento en los casos números 160, *Josefa Rivera* v. *Pastor Díaz Molinaris,* sobre indemnización de daños y perjuicios por incumplimiento de promesa de matrimonio y No. 1377, *Josefa Rivera* v. *Pastor Díaz Molinaris,* sobre indemnización de daños y perjuicios por seducción, cuyas mociones están fechadas en 26 de enero de 1911; y la escritura de reconocimiento de hijo natural No. 1 otorgada en 26 de enero de 1911, ante L. Abella Blanco por Ramón Jiménez Rodríguez y Josefa Rivera.

Ante de analizar las declaraciones prestadas en el juicio por parte de los testigos de El Pueblo queremos hacer constar que los apelantes sostienen que no se ha probado el *corpus delicti* y que Ramón Jiménez es un cómplice, que su declaración no ha sido corroborada y que antes de que declaremos que la prueba es suficiente para sostener una sentencia condenatoria debemos expresar en qué forma ha sido corroborada la declaración de ese cómplice. Estamos conformes en que las declaraciones de los cómplices deben ser corroboradas de acuerdo con el artículo 253 del Código de Enjuiciamiento Criminal y también en que cuando se sostiene como en este caso que la declaración del cómplice no ha

sido corroborada, debemos expresar cómo lo ha sido, si es que tal corroboración existe.

Los apelantes hacen gran hincapié en la opinión del caso de *El Pueblo* v. *Coffey,* 161 Cal., 433, que estiman similar al presente y en el que se declaró que la declaración del cómplice no estaba corroborada. Nosotros creemos que aquel caso no es similar al presente.

En el caso citado se declaró que una parte de la declaración del cómplice no puede corroborar su propio testimonio; también que las manifestaciones de testigos no cómplices de que el acusado había votado a favor de una franquicia para una compañía no era corroboración de que el voto se había emitido por consecuencia de una conspiración; y que el que tal compañía otorgó un documento por el que se hizo responsable a Coffey de cualquier delito que pudiera haber cometido en su calidad de miembro del Tribunal de Franquicias tampoco corrobora la declaración del cómplice respecto a la conspiración.

Repetimos que no creemos que este caso sea similar al presente en el que se otorgó un documento, la escritura de 26 de enero de 1911, por el cual aparece Ramón Jiménez y Josefa Rivera reconociendo que ambos habían tenido relaciones amorosas y que el producto de ellas fué el nacimiento del niño Ramón, documento que por sí solo no demuestra la conspiración pero sí cuando Josefa Rivera declara la falsedad de los hechos contenidos en el mismo, cuando niega haber conocido ni tenido jamás relaciones amorosas con Jiménez ni que su hijo Ramón lo sea de dicha persona, y cuando sostiene que se le manifestó que aquél documento era un reconocimiento que hacía Pastor Díaz de dicho niño y que bajo la creencia de que era así fué que firmó las mociones de desistimiento de los pleitos que contra éste tenía establecidos. Por consiguiente esta declaración de Josefa Rivera junto con la existencia de ese documento y de las mociones de desistimiento corroboran la declaración de Ramón Jiménez de que todo ello fué el resultado de una confabulación;

confabulación que casi siempre es necesario probar por prueba circunstancial dado que la naturaleza del delito hace generalmente imposible que se justifique por prueba directa las entrevistas y convenios de la conspiración.

En apoyo de lo que decimos, transcribiremos lo pertinente de los siguientes casos:

"En este caso el hecho en cuestión era, desde luego, el de la conspiración por parte del acusado con las demás personas que se mencionan, en la comisión del delito; pero para dejar establecido este hecho no es necesario probar que las partes se confabularon y en realidad se pusieron de acuerdo para llevar a cabo conjuntamente el acto criminal. Por lo general sería imposible presentar dicha prueba por evidencia directa dadas las reservas con que se adoptan los planes para cometer actos ilegales. La prueba lo mismo puede ser indirecta que directa, consistiendo en inferencias o presunciones, determinando el código que en el juicio de una causa podrá presentarse prueba de cualesquiera hechos de los cuales se presumen o infieren lógicamente los hechos en cuestión, y al ejercitar el jurado su criterio tomando en consideración las inclinaciones ordinarias o pasiones de los hombres, puede hacer deducciones o inferencias de los hechos por virtud de las cuales quede establecido el hecho o hechos en cuestión." *People* v. *Donnelly*, 143 Cal., 398.

"Todos los libros de texto están de acuerdo en que la prueba para establecer una conspiración puede ser, y generalmente tiene que ser circunstancial, dada la naturaleza del caso. Todo acto en que exista un convenio para infringir la ley o cometer un fraude es secreto, y por lo general resulta probado por otros hechos distintos y aislados tendentes a mostrar el propósito común. El designio o propósito común constituye la esencia de la acusación y no es preciso probar, al tratar de establecerlo, que las partes se confabularon y ciertamente convinieron en dicho designio y en ponerlo en práctica por los medios ordinarios.

"El jurado estará justificado en deducir que existe una conspiración siempre que el Fiscal pruebe fuera de duda razonable, por el testimonio de testigos dignos de crédito, que dos o más de cualquiera de los acusados se propusieron realizar con sus actos el mismo designio u objeto ilegal, uno ejecutando parte de él y el otro otra parte del mismo para realizarlo enteramente, aun cuando jamás se reunieran para concertar los medios o para poner en práctica dicho propósito. Y tampoco es necesario que la conspiración tuviera su ori-

gen en las personas acusadas. Toda persona que tome parte en una conspiración en cualquier estado en que ésta se encuentre, con ·conocimiento de su existencia la ley la considera como parte en todos los actos ejecutados por cualquiera de las demás personas, antes o después, en ayuda del propósito común." * * * *United States* v. *Sacia,* 2 Fed., 754–757.

"Una conspiración puede ser probada por inferencias o por medio de evidencia circunstancial." * * * 6 Am. & Eng. Encyc. of Law, 864.

Una conspiración lo mismo que casi todos los demás hechos puede probarse mediante prueba circunstancial. Pero ciertamente que no ocurre con frecuencia que los hechos directos del propósito común, o sea lo que constituye la esencia de la conspiración pueden ser probados por algún otro medio que no sea por los hechos independientes que se relacionen más o menos remotamente con el objeto principal y que tienden a convencer de un modo razonable y lógico a la mente del juzgador de la existencia de la conspiración.

· "Según expresa Greenleaf 'Si se prueba que los acusados perseguían con sus actos el mismo propósito, frecuentemente por iguales medios, realizando uno una parte y el otro la otra para completarlo teniendo en perspectiva la ejecución del mismo fin, el jurado estará justificado en llegar a la conclusión de que estaban confabulados en una conspiración para realizar tal objeto. (3 Greenleaf Ev., sec. 93; *United States* v. *Doyle,* 6 Saw., 612.)" * * * *People* v. *Bentley,* 75 Cal., 409.

"En un caso en que varias personas habían tomado parte en una conspiración para defraudar al demandante, se resolvió que el acto realizado por cualquiera de los acusados en ayuda del designio común, de acuerdo con el plan de la conspiración, era el acto de todos, siendo cada uno responsable por igual por las consecuencias del mismo. *Paige* v. *Parker,* 43 N. W., 363; 8 Am. Dec., 172." * * * 6 Am. & Eng. Encyc. of Law, 871.

De acuerdo con lo expuesto, si en un caso de conspiración se prueba que los acusados por sus actos persiguen el mismo objeto, por los mismos medios y ejecutando unos una parte y otra parte otros, el delito queda justificado como ha ocurrido en el presente caso.

La participación que cada acusado ha tomado en la realización de la conspiración debe tomarse teniendo en cuenta todos los actos por cada uno de ellos verificado para poder

por ellos llegar a la conclusión de si todos son autores de la conspiración.

La declaración de Ramón Jiménez (*a*) Chivo ha sido corroborada como hemos dicho por Josefa Rivera, ya que ésta nos habla de que Abella y Goyco estuvieron en su casa con el fin de firmar la escritura de reconocimiento, aun cuando haciéndola creer que era para que Pastor le reconociera el niño y transara los pleitos en esta forma, lo que demuestra que Abella y Goyco formaban parte de la conspiración. En cuanto a Pastor Díaz, la declaración de Ramón Jiménez de que le llevaba a Guayama para que le reconociera a un hijo que había tenido con Josefa Rivera, está corroborada por Miguel Díaz Cortada (*a*) Ropero, testigo que además vió a Ramón Jiménez en la notaría de Abella; Sama y Mestre corroboran a Ramón Jiménez, el primero en el particular referente a la escritura y de que querían que le reconociera un niño que no era suyo, y ambos en que en el día en que esos hechos ocurrieron los vieron juntos en el despacho del Sr. Ramos y hablando con éste y Pastor Díaz; en cuanto a Pastor Díaz las declaraciones de Marcelino Villalí y de Francisco Jiménez le imputan sus admisiones en esos actos, y en cuanto a Pedro Goyco, además de las declaraciones de Josefa Rivera, las manifestaciones que hizo a Darío Suárez demuestran su participación en el delito. Así pues, por el conjunto de toda esa evidencia, podemos llegar a la conclusión de que todos los apelantes tomaron participación directa en la conspiración.

El noveno y último motivo del recurso, lee de este modo:

"Al no haber hecho aplicación a la prueba aportada por El Pueblo de los principios jurídicos consignados en los incisos primero, tercero y cuarto del artículo 162 de la Ley de Evidencia."

El artículo a que se hace referencia establece que el efecto de la evidencia no es arbitrario, sino que se ejecutará con discreción judicial; que el tribunal no está obligado a decidir de conformidad con la declaración de cualquier número de

testigos que no llevaren a su ánimo la convicción, contra un número menor o una presunción u otra evidencia que le convenciera; que un testigo que hubiere faltado a la verdad en una parte de su declaración deberá ponerse en duda respecto a otra; y que el testimonio de un cómplice debe mirarse con desconfianza, y la evidencia que resulta de la admisión oral de una parte, con cautela.

Al consignar ese artículo las reglas que hemos mencionado lo único que hace es llamar la atención del tribunal sobre determinadas circunstancias que debe tener presente acerca de la evidencia para que las tenga en cuenta al tomar sus conclusiones respecto a la prueba, pero no le priva de su facultad discrecional para apreciarla, y aunque existan contradicciones en un testigo, si no son sobre hechos esenciales puede creerlo, si estima fuera de duda razonable que en lo demás dijo la verdad.

Es cierto que en este caso los testigos Ramón Jiménez y Josefa Rivera incurrieron en algunas contradicciones, pero a pesar de ello el juez podía creer que dijeran la verdad en los hechos esenciales de este proceso. Es regla bien sentada y nosotros la hemos consignado en muchos casos, que no intervendremos en la apreciación que de la evidencia haga el tribunal *a quo* a menos que se nos demuestre que al apreciarla obró influído por pasión, prejuicio o manifiesto error; y las contradicciones en que incurrieran Ramón Jiménez y Josefa Rivera en parte de sus testimonios no fueron tan importantes que hiciera necesario en absoluto el rechazarlos. El juez de la corte inferior que oyó declarar a esos testigos les dió crédito, a pesar de algunas contradicciones en que incurrieron, y como no creemos que por ellas estuviera obligado a rechazar todos sus testimonios, no podemos concluir que cometió el error alegado.

Para concluir diremos que también los acusados impugnaron la acusación porque según los hechos contenidos en ella se tendía a conseguir el desistimiento de dos pleitos,

la índole de los cuales aparece de la propia acusación y en ninguno de ellos se ventilaban posibles derechos del menor Ramón Rivera por lo que sostuvieron que no se desprende de dicha acusación que conspiraran para privar al menor de sus derechos. La resolución negativa de ellos por la corte se estima como un error que Pedro Goyco consigna en su alegato bajo el número 3.

La especificación que de los dos pleitos de Josefa Rivera se hace en la acusación es sólo por el cargo de que la conspiración tenía entre otros propósitos el de pervertir y obstruir la justicia pública, lo cual no obstaculiza que también tuviera por fin el de defraudar al expresado menor en sus derechos; pero aunque tal propósito no existiera o no pudiera realizarse con los actos que se imputaron a los acusados, siendo la acusación suficiente en sus demás cargos no podía prosperar esa excepción, ya que cuando una acusación comprende distintos cargos o maneras de realizar el delito la alegación suficiente de cualquiera de ellos y su prueba justifican una condena. En el caso de *El Pueblo* v. *Collazo*, 20 D. P. R., 203, dijimos que cuando la ley castiga como delito el hacer alguna de las varias cosas que menciona disyuntivamente todas o algunas de ellas pueden ser imputadas conjuntamente.

Habiendo llegado a la conclusión de que la corte inferior no cometió los errores que se alegan en este recurso, debemos declararlo sin lugar y confirmar la sentencia apelada.

*Confirmada la sentencia apelada.*

Jueces concurrentes: Sres. Presidente Hernández y Asociados Wolf y del Toro.

El Juez Asociado Sr. Hutchison no formó parte del tribunal en la vista de este caso.