EL PUEBLO DE PUERTO RICO, demandante y apelante, *v.* BENITO CABRERA y SECUNDINA GARCÍA, acusados y apelados.

No. 5166.—*Sometido:* Abril 3, 1934.—*Resuelto:* Julio 11, 1934.

*Ricardo A. Gómez, Fiscal,* abogado de El Pueblo, apelante; *Samuel R. Quiñones* y *R. H. Blondet,* abogados de los apelados.

EL JUEZ PRESIDENTE SEÑOR DEL TORO, emitió la opinión del tribunal.

Se imputa a los acusados la comisión de un delito previsto y castigado en el artículo 471 del Código Penal, consistente en haber vendido a su hijo legítimo Santiago Cabrera dos fincas rústicas que había ya vendido a ''Sucesores de

Huertas González,'' voluntariamente y con la intención de defraudar al primitivo comprador.

Alegaron su inocencia los acusados y solicitaron juicio por jurado. En el acto de la vista que tuvo lugar el 9 de febrero de 1933, después de haber introducido evidencia el Fiscal sobre el primer contrato de venta, al tratar de demostrar la existencia del segundo, ocurrió lo que sigue:

''Sr. Fiscal: Voy a presentar como prueba la escritura a favor del hijo de crianza, Santiago Cabrera . . .

\* \* \* \* \* \* \*

''Sr. Quiñones: Nos vamos a oponer a la admisión del documento en evidencia, porque no es copia de escritura pública, ni aún el original siquiera es escritura pública, porque la ley requiere que cuando una de las partes no sabe firmar, firma a su ruego por ella uno de los testigos. En este documento está firmando por una de las partes una persona que no es testigo en el instrumento . . .

\* \* \* \* \* \* \*

''Sr. Fiscal: Yo no voy a discutir nada de esto. Vamos a suponer que esto fuera un documento privado. Comoquiera que sea, es una venta y es lo único que la Ley de Evidencia requiere, máxime cuando vamos a acompañar a esta escritura una certificación del Registrador de la Propiedad, de que esa compraventa fué inscrita en el Registro. Los contratos son válidos, cualquiera que sea la forma en que se otorguen. Entonces, voy a acompañar una certificación del Registrador de la Propiedad de San Juan, donde esta escritura consta debidamente inscrita en el Registro.

''La Corte: ¿Pero en qué quedamos con la escritura, la retira?

''Sr. Fiscal: La presento en unión de la certificación del Registrador de la Propiedad de San Juan, acreditando que esta escritura está debidamente inscrita en el Registro de la Propiedad. Y no voy a discutir ahora si es necesaria la firma, si es necesario el testigo en el instrumento, porque se prolongaría esta cuestión indebidamente. Lo fundamental es que hubo una venta, y que después los acusados, con el propósito de defraudar, la vendieron a su hijo legítimo, y este hijo legítimo aparece hipotecando a un hermano de él . . .

\* \* \* \* \* \* \*

''La Corte: La Corte, después de haber estudiado y considerado debidamente la moción de la defensa en cuanto a la admisibilidad de la escritura pública ofrecida en la mañana de hoy por el Fiscal, sostiene la oposición de la defensa y no admite la escritura, por en-

tender que no es válida como documento público, y como tal, no tiene eficacia legal.

"Sr. Fiscal: Yo voy a solicitar de Vuestro Honor la reconsideración de la resolución de la corte, por los siguientes fundamentos, los que expondré después que le tome declaración al testigo Santiago Cabrera."

Se llamó a declarar en efecto a Santiago Cabrera, o sea, el alegado segundo comprador y al preguntársele si tuvo algún negocio con los acusados, se opusieron los abogados de éstos, resolviendo la Corte el incidente así:

"La Corte: En este caso se trata de una acusación por infracción al Artículo 471 del Código Penal, consistente en que los acusados vendieron ciertas fincas que se describen en la acusación a dos personas distintas, en distintas ocasiones. La primera venta hecha a Huertas González fué probada por medio de escritura pública, que se presentó y que la Corte aceptó, a pesar de la oposición de los acusados. La segunda venta trató de probarse por medio de una escritura que la Corte entiende que es nula, por cuanto los otorgantes, o algunos de ellos, no sabían firmar, y fué firmada por los otorgantes que no sabían firmar por una persona que no era uno de los testigos instrumentales del documento; y según tiene repetidamente declarado nuestro Tribunal Supremo, tal documento es nulo·de toda nulidad.

"Ahora, en vista de la nulidad del documento, que el Fiscal acepta que es nula la escritura, ha tratado de probar la segunda venta por medio de prueba testifical; y la cuestión a determinar es si ese contrato de venta de bienes inmuebles, que la ley exige que conste por escrito, puede probarse por medio de prueba testifical y prescindiendo del documento público que exige la ley. A nuestro juicio, son dos cuestiones distintas: la validez del contrato entre las partes y la prueba del contrato. El contrato será válido, podrían compelerse mutuamente a cumplirlo las partes que lo celebraron; pero al tratar de probar ese contrato en una acción criminal como ésta, exige entonces la ley que esa prueba conste en documento público y no por prueba oral.

\* \* \* \* \* \* \*

"Por tales fundamentos, la Corte declara con lugar la objeción de la defensa en cuanto a que se pruebe por medio de prueba oral la existencia o celebración de este segundo contrato a que se refiere la acusación.

"Sr. Fiscal: Comoquiera que ésta es una cuestión que la resolución de ella mata prácticamente el caso del Fiscal, y como Vuestro Honor sabe que una orden de Vuestro Honor al Jurado para que traiga un veredicto absolutorio es apelable al Tribunal Supremo, con permiso de Vuestro Honor yo voy a consignar en el récord lo que yo trataba de probar con el testigo Santiago Cabrera.

"El Fiscal presenta al testigo Santiago Cabrera con el propósito de demostrar que allá por el día 12 de julio de 1932 convino con el acusado Benito Cabrera, y la acusada María Secundina García, en comprar las dos fincas descritas bajo la letra A y la letra B en la escritura que voy a solicitar ahora que se marque por el Secretario como prueba ofrecida por el Fiscal y no admitida por la Corte, y que ha sido marcada por el Secretario como Exhibit 1, ofrecido por el Fiscal y no admitido por la Corte. Trata de presentar también el Fiscal como prueba una certificación del Registrador de la Propiedad relativa a la inscripción de la compraventa a que se hace referencia en el Exhibit 1 del Fiscal como prueba ofrecida por el Fiscal y no admitida por la Corte y también negada por la Corte, y que fué marcada por la Corte como Exhibit 2 de prueba ofrecida por el Fiscal y no admitida por la Corte.

". . . El testigo Santiago Cabrera iba a declarar que había concertado la compraventa de esas dos fincas con los acusados por el precio de $12,000, y que en el mismo momento había hipotecado a un hermano suyo por $2,000.00 las dos fincas que se mencionan y que se describen suficientemente en la escritura pública No. 245, que fué la que se presentó como prueba por el Fiscal y que no fué admitida por la Corte. La Corte negó la admisión oral del contrato de compraventa entre Santiago Cabrera y los acusados, la prueba oral de la existencia del contrato de compraventa entre Santiago Cabrera y Secundina García.

"De esta resolución de la Corte el Fiscal respetuosamente anota una excepción . . . Terminé mi caso."

Entonces se pidió por la Defensa que se instruyera al Jurado a fin de que rindiera un veredicto absolutorio y la Corte accedió en la siguiente forma:

"La Corte: Señores del Jurado: Como en este caso incumbía al Pueblo probar que hubo dos ventas de las fincas a que se refiere la acusación, y el Fiscal no ha podido probar, de acuerdo con el criterio de la Corte, la venta últimamente celebrada, y que de ser posible probar constituiría entonces el delito de doble venta, o sea, lo

previsto en el Artículo 471 del Código Penal, no hay ninguna cuestión que someter al Jurado, sino simplemente ordenar al Jurado que rinda un veredicto de no culpable, puesto que la evidencia no sería nunca suficiente para declarar culpable a los acusados.

"La Corte les instruye para que dicten en este caso un veredicto de no culpable, y al efecto nombra al señor Astol Presidente del Jurado, y le instruye para que se sirva firmar el veredicto."

Rendido el veredicto por el Jurado la Corte lo aceptó declarando a los acusados no culpables y absolviéndolos libremente.

El propio día nueve de febrero interpuso el Pueblo por su Fiscal la presente apelación de acuerdo con lo prescrito en el art. 348 No. 6 del Código de Enjuiciamiento Criminal, como sigue:

"Art. 348.—El ministerio público puede establecer apelación:

\* \* \* \* \* \* \*

"6.—De una orden del Tribunal al jurado mandando que éste pronuncie veredicto a favor del acusado."

A nuestro juicio la orden de la Corte dirigida al Jurado para que rindiera un veredicto absolutorio basada como lo fué en sus resoluciones sobre la no admisión de la evidencia que presentara el Fiscal, está equivocada.

Dice el artículo 471 del Código Penal que es el que prevé y castiga el delito imputado a los acusados:

"Art. 471. Toda persona que habiendo vendido, negociado o enajenado alguna propiedad mueble o inmueble o interés en ella, u otorgado alguna obligación o convenio para la venta de dicha propiedad, voluntariamente volviere a vender, negociar o enajenarla, o cualquiera parte de la misma, o interés en ella, con intención de defraudar a anteriores o subsiguientes compradores, o que voluntariamente y con intención de defraudar a éstos, otorgare alguna obligación comprometiéndose a vender, negociar o enajenar dicho terreno o solar, o parte del mismo, a cualquiera otra persona, incurrirá en pena de presidio por un término de uno a diez años." .

Con respecto a la primera venta no hay cuestión. Con respecto a la segunda el fiscal se vió impedido de demostrarla

porque en la escritura pública en que se hizo constar en vez de firmar por los vendedores—que no sabían hacerlo—uno de los testigos del documento, lo hizo otra persona.

Es cierto que la Ley Notarial de modo terminante prescribe que si los otorgantes o alguno de ellos no supiere o no pudiere firmar, lo expresará así el Notario, debiendo firmar uno de los testigos, escribiendo de su puño, en ante firma que lo hace por sí como testigo, y a nombre del otorgante, que no sepa o no pueda verificarlo. Sección 14 de la Ley Notarial de 1906.

Y es cierto también que esta Corte ha resuelto que si la firma de uno de los otorgantes de un documento público no consta en la forma exigida por el estatuto, es lo mismo que si no existiera, y el documento debe, en tal virtud, considerarse como nulo de acuerdo con lo prescrito en la sección 20, No. 3, de la Ley Notarial. *Banco Territorial* v. *Registrador,* 22 D.P.R. 222.

Pero ello no quiere decir que porque el documento no se otorgara de acuerdo con la ley, el contrato en sí dejara de existir. Si hubo consentimiento, objeto y causa, el contrato existió. Y para demostrar esos elementos pudo y debió admitirse la escritura como un principio de prueba que pudo completarse con la evidencia de testigos. También la certificación del registro.

El acto delictivo imputado a los acusados consiste esencialmente en vender habiendo ya vendido, voluntariamente y con el propósito de defraudar al primitivo comprador. Y aquí la prueba que trató de introducir el fiscal lo era para demostrar que los acusados habiendo ya vendido las fincas de que se trata a una persona para saldar con ello las deudas que con esa persona tenían contraídas, volvieron a venderlas a su hijo quien llevó inmediatamente el documento público en que constaba el contrato al Registro logrando que el Registrador lo inscribiera antes de presentarse el título otorgado al primer comprador lo que de acuerdo con lo prescrito en

el art. 1362 del Código Civil, Ed. 1930, resolvía el conflicto de la doble venta a su favor.

La intención fraudulenta no dejaba de existir porque el documento público otorgado resultara luego nulo. El documento se otorgó. No sólo se otorgó, si que se inscribió en el registro. Para inscribir su venta el primer comprador se vería obligado a recabar de las partes contratantes en el segundo contrato el otorgamiento voluntario de otro documento dejando sin efecto el ya inscrito o a iniciar un pleito ante las cortes pidiendo la nulidad del segundo contrato y la cancelación de su inscripción en el registro. La situación puede complicarse con la aparición en escena de terceros adquirentes de quien del registro aparecía como dueño.

Habiendo llegado a las anteriores conclusiones, parece que la orden recurrida debería revocarse, revocándose también la sentencia absolviendo a los acusados que fué la consecuencia de la misma.

Sin embargo, por errónea que la orden fuera, es lo cierto que el Jurado la obedeció rindiendo un veredicto por el cual declaró no culpables a los acusados y que basándose en ese veredicto la Corte dictó sentencia absolviéndolos del delito que se les imputaba. Y en situación semejante se resolvió por esta Corte Suprema en el caso de *El Pueblo* v. *Noonan,* 46 D.P.R. 724, siguiendo el de *Kepner* v. *United States,* 195 U. S. 100, que la causa queda definitivamente resuelta y no cabe seguir procedimiento ulterior alguno.

No importa que la cuestión no haya sido aquí levantada. Es fundamental y en evitación de que puedan seguirse procedimientos ulteriores que habrían de resultar necesariamente inútiles, debe resolverse.

En tal virtud, no obstante la conclusión a que llegáramos sobre lo erróneo de la orden de la Corte, como a nada práctico conduciría su revocación, nos limitaremos a desestimar por académico el recurso interpuesto por el Ministerio Público.

Esta corte, en el caso de *El Pueblo* v. *Noonan,* recientemente resuelto (46 D.P.R. 724), ha sostenido el criterio de que una vez absuelto un acusado por el jurado, en virtud de orden perentoria de la corte, la causa queda terminada de un modo definitivo, sin que pueda someterse al acusado a un nuevo juicio por el mismo delito imputado en la acusación. Asentimos a la opinión emitida en dicho caso, abrumados más bien que convencidos por repetidas decisiones de la Corte Suprema de California y principalmente por las conclusiones establecidas en el caso de *Kepner* v. *U. S.,* 195 U. S. 134, citado y comentado en nuestra opinión.

No estamos obligados, sin embargo, a seguir la jurisprudencia del Tribunal Supremo de California interpretando preceptos de ley que han sido puestos en vigor en Puerto Rico, si las conclusiones del referido tribunal son, a nuestro juicio, erróneas. En cuanto a la Corte Suprema de los Estados Unidos, es nuestro deber acatar y respetar sus decisiones, cuando interpreta preceptos de ley vigentes en nuestra Isla. Hecha esta salvedad, pasamos a exponer nuestro criterio sobre esta importantísima cuestión que quizá algún día vuelva a ser sometida a la consideración del más alto tribunal de la nación.

El caso de autos nos hace fijar la atención nuevamente en las cuestiones resueltas en *Kepner* v. *U. S.,* supra, desde que se dictó la sentencia original hasta su revisión por la Corte Suprema de los Estados Unidos. Thomas E. Kepner, abogado que practicaba su profesión en la ciudad de Manila, fué acusado del delito de estafa, por haber hecho uso de fondos pertenecientes a un cliente. El juzgado de primera instancia declaró absuelto al referido abogado. Contra esta sentencia se estableció recurso de apelación. La Corte Suprema de Filipinas revocó la sentencia del juzgado de primera instancia, declaró culpable a Kepner y le condenó a un año, ocho meses y veintiún días de prisión, impidiéndole desempeñar

cualquier cargo público o de confianza y privándole del derecho del sufragio. Este caso puede distinguirse del que ahora nos ocupa en que la causa no fué sometida a un jurado, sino a un juez de hecho y de derecho que apreció la prueba y decretó la absolución del acusado. En nuestro caso se trata de un error de derecho cometido por la corte inferior negando indebidamente la admisión de una prueba y ordenando al jurado un veredicto que declarase absuelto al acusado.

En el caso de *Kepner* v. *U. S.,* supra, no surge de los hechos que el juzgado de primera instancia de Manila, que dictó la sentencia original, fuese inducido por el acusado a incurrir en un error de derecho, y quizá por esta razón podría también distinguirse este caso de aquéllos en que aparece el propio acusado provocando la comisión del error. Esta distinción, sin embargo, tendría que establecerse partiendo de la base de que el acusado únicamente puede aducir con éxito la alegación de *former jeopardy* cuando la decisión errónea de la corte no ha sido provocada por él. No es ésta la jurisprudencia establecida por el Tribunal Supremo de California. Cuando un jurado declara absuelto a un acusado accediendo a los deseos de la corte, aunque esta absolución se deba a un error craso y manifiesto provocado por el propio acusado, el tribunal californiano sostiene la teoría de que una revocación de la sentencia no conduciría a fin práctico alguno, porque el acusado no puede ser nuevamente juzgado por el mismo delito. No obstante, este mismo acusado, si solicita y obtiene la nulidad de una sentencia o veredicto dictado contra él, puede ser nuevamente juzgado por el mismo delito de que fué declarado convicto. *Hopt* v. *Utah,* 104 U. S. 631, 110 U. S. 574, 114 U. S. 488, 120 U. S. 430; *Regina* v. *Drury,* 3 Cox Crim. Cas. 544; S. C. 3 Car. & Kirw. 193; *Commonwealth* v. *Gould,* 12 Gray 171. De modo que de acuerdo con esta teoría el acusado ocupa una posición doblemente ventajosa, porque si es absuelto queda amparado por el precepto constitucional de que no puede ser nuevamente juzgado, y si es condenado puede solicitar la anulación del veredicto o la

sentencia para tener la oportunidad de un nuevo juicio después de haber sido convicto. Esta distinción no parece estar sostenida por la lógica. Si la alegación de *former jeopardy* es buena cuando el acusado resulta absuelto en virtud de un error de derecho de la corte de primera instancia, debería serlo también cuando se deja sin efecto a su ruego una sentencia o veredicto en virtud de errores cometidos contra él. No obstante, los tribunales sostienen que en este último caso el acusado no puede interponer con éxito la defensa de *former jeopardy*. Y si es así, y el principio establecido se basa en que es el propio acusado quien solicita la anulación de esa sentencia o veredicto, a nuestro juicio lógicamente debiera establecerse el mismo principio cuando el acusado induce a la corte a incurrir en un error de derecho que culmina en su absolución. Donde hay la misma razón debe aplicarse el mismo derecho. Conviene advertir que el Juez Holmes, como veremos más adelante, no acepta que pueda renunciarse un derecho fundamental garantizado por la Constitución. El eminente jurista entiende que el acusado no renuncia a ningún derecho, porque no existe doble *jeopardy* cuando se le juzga nuevamente dentro de una misma causa.

No cabe duda de que en estas condiciones la posición del estado es asaz desventajosa. Los errores de derecho cometidos en contra del acusado pueden ser revisados por las cortes superiores para darle al convicto la oportunidad de ser nuevamente juzgado, si los hechos que se le imputan constituyen delito público; pero los errores cometidos en contra del estado no pueden ser corregidos aunque la ley conceda expresamente el derecho de establecer excepciones y de promover una apelación. Las disposiciones de la ley para proteger los derechos del estado resultan baldías y completamente inútiles en el terreno de la práctica, porque no hay posibilidad de hacerlas efectivas. No acertamos a explicarnos la concesión de un nuevo juicio cuando se cometen errores de bulto contra el acusado, y la negación de ese nuevo juicio cuando se cometen errores fundamentales de derecho en contra del

estado. Las opiniones emitidas por la mayoría y la minoría en el caso de *Kepner* v. *U. S.*, supra, deben ser cuidadosamente estudiadas. En la opinión de la minoría, escrita por el Juez Holmes, se dice que un acusado no puede renunciar, y ciertamente no se entenderá que ha renunciado sin expresarlo así, derechos fundamentales de carácter constitucional. Hay peligro (*jeopardy*), según el eminente jurista, desde que se inicia el caso hasta que termina, y el caso no termina hasta que no ha sido definitivamente juzgado. El procedimiento es único y continuado, tocando a su fin cuando el acusado es condenado o absuelto, y la sentencia se hace firme por haber transcurrido el plazo señalado para apelar, cuando exista apelación, o por haberse resuelto definitivamente el caso por el tribunal de última instancia. A juicio del Juez Holmes el acusado puede ser juzgado en más de una ocasión, siempre que se trate de una misma causa. Lo que no puede hacerse dentro del precepto constitucional, es someter a un acusado a un nuevo proceso y a un nuevo juicio, después de haber sido absuelto en un caso separado o independiente de aquél en que fué definitivamente juzgado.

En *Kepner* v. *U. S.*, supra, el juzgado de primera instancia declaró absuelto al acusado. Apeló el ministerio público de esta sentencia, acogiéndose a una ley que autorizaba el derecho de apelación. La Corte Suprema de Filipinas revocó la sentencia y declaró culpable al acusado. El caso fué llevado a la Corte Suprema de los Estados Unidos en virtud de un auto de errores. La sentencia fué revocada y el acusado declarado absuelto. El caso fué resuelto por una mayoría de cinco jueces contra cuatro. Disintieron los Jueces Holmes, White, McKenna y Brown. Se escribieron dos opiniones disidentes: la primera por el Juez Holmes, con la concurrencia de los Jueces White y McKenna, dice así:

"Lamento no poder convenir con la decisión de la mayoría de esta corte. El caso es de suma importancia no solamente por su significación inmediata en la administración de la justicia en las Islas Filipinas, toda vez que las palabras usadas en la ley del Congreso

figuran también en la Constitución, sino aun más porque la decisión necesariamente conlleva una interpretación de este último documento. Si, como es posible, la prohibición constitucional se extendiera a delitos menos graves, Ex parte Lange, 18 Wall. 163, 173, habríamos establecido en el país una doctrina que abarca todo el derecho criminal, que, a mi juicio, tendría serias y graves consecuencias. Al presente existe en este país más peligro de que los criminales evadan la justicia, de que sean sometidos a opresión. Mas no me detendré a considerar o a exponer las consecuencias en detalle puesto que no se supone que tales consideraciones sean tenidas en cuenta por los jueces a no ser para inducirlos a aceptar una de dos interpretaciones, o como un último recurso tácito en caso de duda. Es más pertinente hacer notar que me parece que lógica y razonablemente no puede decirse que un hombre ha sido puesto en peligro (*jeopardy*) más de una vez cuando se trata de una misma causa, no importa la frecuencia con que se.le juzgue. El peligro es único y continuado. desde el comienzo hasta el fin de la causa. Todos convienen en que el principio en su origen prohibía un juicio en una causa nueva o independiente cuando ya el reo había sido juzgado una vez. Pero no existe regla alguna al efecto de que un hombre no puede ser juzgado dos veces en el mismo caso. Esta corte ha resuelto que un acusado puede ser juzgado por segunda vez, aun en casos de pena capital, si el jurado no se pone de acuerdo, United States v. Pérez,. 9 Wheat. 579; véase Simmons v. United States, 142 U. S. 148; Logan v. United States, 144 U. S. 263; Thompson v. United States, 155 U. S. 271, o, no obstante ponerse de acuerdo y haber llegado a un veredicto, si este último es anulado a virtud de las excepciones. tomadas por el acusado por error cometido durante el juicio. Hopt v. People, 104 U. S. 631, 635; 110 U. S. 574; 114 U. S. 488, 492; 120 U. S. 430, 442; United States v. Ball, 163 U. S. 662, 672. Aun puede juzgársele mediante una nueva acusación si la sentencia en la primera ocasión es anulada por haberse presentado una moción. Ex parte Lange, 18 Wall. 163, 174; 1 Bish. Crim. Law (5ª. ed.) párrafo 998. Me referiré, además, a las opiniones de Kent y Curtis en People v. Olcott, 2 Johns. Cas. 301; S. C., 2 Day, 507, n.; United States v. Morris, 1 Curtis, 23, y a la bien reconocida decisión en el de State v. Lee, 65 Connecticut, 265.

''Si un estatuto concede al Pueblo el derecho a tomar excepciones, a mi juicio sería imposible sostener que la Constitución protegería al acusado de ser juzgado nuevamente. El peligro no sería mayor para el acusado, al ser juzgado por segunda vez a causa de un error de derecho a su favor, que al ser juzgado nuevamente por un error

que le perjudicó. No importa que el acusado solicite el segundo juicio. En un caso de pena capital, como el de Hopt v. People, un hombre no puede renunciar, y ciertamente no puede considerarse que ha renunciado sin significarlo, derechos constitucionales fundamentales. Thompson v. Utah, 170 U. S. 343, 353, 354. De ordinario tal renuncia no es expresada ni se piensa en ella. Además, no podría imaginarse que la ley niegue a un acusado el derecho a corregir un error fatal, a menos que renuncie otros derechos que debido a su importancia la Constitución de los Estados Unidos ha garantizado expresamente en una de sus cláusulas.

"Podría decirse que cuando el acusado toma excepciones, solamente está tratando de deshacerse de un peligro y que en tanto en cuanto el veredicto le favorezca, como cuando se le declara culpable de homicidio mediante acusación de asesinato, el peligro seguirá subsistiendo, de acuerdo con algunas decisiones, para ser juzgado nuevamente tan sólo por el delito menor, de suerte que el peligro sólo continúa con posibilidad de librarse del mismo. Soy de opinión que las decisiones a que se hace referencia son erróneas, mas asumiendo que sean ciertas, debemos considerar su posición en el momento en que sus excepciones son sostenidas. El primer veredicto ha sido anulado. El peligro por éste creado ha terminado y la cuestión que surge es qué debe hacerse con el acusado. Toda vez que en ese momento ya no está en peligro por el primer veredicto, si un segundo juicio en el mismo caso equivale a un segundo peligro aun en lo que al delito menor se refiere, el acusado tiene derecho a que se le ponga en libertad. En vista de estas dificultades se ha sostenido que en principio el reo tiene ese derecho si en el primer juicio se comete un error de derecho. 1 Bish. Crim. Law (5ª. ed.), párrafos 999, 1047. Pero aun Mr. Bishop admite que las decisiones se pronuncian en sentido contrario, y el punto ya ha sido resuelto en esta corte por los casos arriba citados. Habiéndose destruído por fortuna ese mal, la necesaria alternativa es que la Constitución permite un segundo juicio en la misma causa. La razón, sin embargo, no es la existencia de la ficción de que un hombre se halla en peligro en caso de error, toda vez que puede admitirse que éste se halla en peligro aun cuando el error sea patente de la faz de los autos como cuando se le juzga por razón de una acusación defectuosa, si la sentencia no es anulada. United States v. Ball, 163 U. S. 662. Además, de ser cierta la ficción, ella sería igualmente cierta cuando el error de derecho se comete en favor del acusado. La razón que aduzco es que solamente puede haber un peligro en una causa. No

he visto otra, a no ser la sugestión de renuncia, y a mi juicio ésa no puede subsistir.

"Si cuanto he dicho hasta aquí es correcto, no se necesitan argumentos adicionales para demostrar que un estatuto puede autorizar al Estado a apelar de la decisión de un magistrado para ante un tribunal superior, al igual que al acusado. Esto último ocurre diariamente, mas no hay duda de que el reo se halla en peligro mientras se somete a juicio ante el magistrado y que una condena o absolución de que no se apela impediría que se le procesara por segunda vez. Esto es lo que se resolvió, y es cuanto se decidió o indicó, pertinente a este caso, en el de Wemyss v. Hopkins, L. R. 10, Q. B. 378. Por las razones expuestas debe considerarse que un segundo juicio en la misma causa es tan sólo la continuación del peligro que comenzó con el juicio en la corte inferior."

Copiamos a continuación la opinión del Juez Asociado Sr. Brown:

"Bajo nuestro sistema de jurisprudencia anglosajón siempre he creído que un veredicto absolutorio dictado a virtud de una acusación válida ponía fin al peligro, que ni en la misma corte ni en una corte de apelaciones podían entablarse ulteriores procedimientos para revisarlo, y que era en extremo dudoso si aun el Congreso podía constitucionalmente autorizar tal revisión.

"Admitiendo todo esto creo, sin embargo, que al hacer el principio extensivo a las Islas Filipinas, la intención del Congreso fué usar las palabras en el sentido que hasta ahora se les había dado en aquellas islas. Por aquella ley, que no conocía el juicio por jurado, el peligro no terminaba, si se apelaba para ante la audiencia o Tribunal Supremo, hasta que este último cuerpo actuara en el caso. Los procedimientos habidos ante la corte de primera instancia en todos los casos importantes eran revisables en apelación por el Tribunal Supremo, el cual actuaba finalmente sobre el caso y ponía fin al peligro. Éste fué evidentemente el criterio del comandante militar en su orden general No. 58, y de la Comisión Filipina en la ley de 10 de agosto de 1901 (No. 194), que autorizaban una apelación para ante el Tribunal Supremo, aun después de haberse dictado sentencia absolutoria. Creo que ésta debió también ser la intención del Congreso, especialmente en vista de la sección 9 de la ley de Filipinas de julio 1, 1902, que dispone que 'el Tribunal Supremo y las cortes de primera instancia de las Islas Filipinas poseerán y ejercerán jurisdicción *en la forma ya provista* . . . sujetá

a la autoridad de dicho gobierno para alterar la práctica y forma de procedimiento.' Me parece imposible suponer que fuera la intención del Congreso poner en manos de un solo juez la facultad grande y peligrosa de absolver definitivamente los criminales más notorios.''

El Juez Brown se refiere a una ley del Congreso, aprobada en 1902, para la administración de los asuntos relacionados con el gobierno civil en las Islas Filipinas, cuya ley, entre otras cosas, disponía que ninguna persona sería colocada en peligro de ser castigada dos veces por el mismo delito. Como hemos dicho, la ley de Filipinas concedía al gobierno, lo mismo que al acusado, el derecho de establecer el correspondiente recurso de apelación. La mayoría de la corte resolvió que esta Ley había sido derogada por la ley del Congreso prohibiendo que un acusado fuese por segunda vez puesto en peligro (*jeopardy*) por el mismo delito. La opinión disidente del Juez Brown trata de armonizar la ley de Filipinas con la ley aprobada por el Congreso. En la opinión de la mayoría se citan preceptos del Fuero Real y de las Siete Partidas, según los cuales una persona absuelta de un delito en virtud de una sentencia válida no puede ser acusada después por el mismo delito excepto en ciertos y determinados casos. Bajo este sistema de leyes, según la mayoría, el juicio se consideraba como un procedimiento continuado, quedando el acusado protegido contra una segunda convicción después que el juicio final había sido terminado en la debida forma legal. Es de notarse que esta doctrina se acerca mucho a la teoría sostenida en la opinión de la minoría escrita por el Juez Holmes.

El caso de *El Pueblo* v. *Noonan* y el que en estos momentos nos ocupa, constituyen un ejemplo de la posición desventajosa del estado para defender los derechos que le han sido confiados. Para nosotros es claro que en ambos casos la corte incurrió en error. Estamos de acuerdo con las conclusiones establecidas en la opinión emitida por el Juez Presidente Sr. del Toro en el caso de autos en cuanto al error de la corte

negando la admisión de cierta prueba y ordenando la absolución perentoria del acusado.

En el caso de *El Pueblo* v. *Noonan*, el Pueblo ofreció prueba tendente a demostrar que el día 5 de noviembre de 1931, entre una y dos de la tarde, se dirigía del Condado hacia San Juan, por el puente "Dos Hermanos" que se tiende sobre la bahía del Condado, un *truck* de la Porto Rican Express Co., conduciendo unas cajas de mercancías; que dicho *truck* venía guiado por Antonio Cruz Jiménez; que en dicho *truck* venían también sentados en las cajas Carmelo Torres, mirando hacia delante, y Santiago Rodríguez, mirando hacia atrás; que el *truck* era conducido por la orilla derecha del puente del Condado para San Juan, que era la que le correspondía; que cuando había caminado el *truck* dentro del puente como una cuarta parte del mismo, apareció en el puente detrás del *truck*, esto es, en la misma dirección, un automóvil de turismo, guiado por el acusado a mucha velocidad, y le pasó al *truck* y al pasarle le dió un golpe terrible por el lado izquierdo que lo lanzó a la laguna, dando el *truck* una voltereta y quedando volcado en la laguna, con el frente para el Condado; que el *truck* se fué a la laguna con todos sus ocupantes, resultando Torres y Rodríguez con serias contusiones, y Antonio Cruz Jiménez, que lo guiaba, muerto por contusiones recibidas al quedar pillado su cuerpo debajo del *truck* al arrastrarle éste en su caída a la laguna.

La prueba anteriormente relacionada demuestra claramente que la corte inferior incurrió en error al ordenar la absolución perentoria del acusado. Esa prueba ha debido ser sometida al jurado, único juez llamado a resolver las cuestiones de hecho y determinar el grado de credibilidad que deban merecer los testigos. Si la prueba es débil o si no lo es, si merece crédito o si no debe ser creída, es cuestión a determinar por los jueces de hecho y no por el juez que preside el tribunal, que únicamente debe intervenir en las cuestiones de derecho sometidas a su consideración.

En el estado de California no se concede a los jueces la

facultad de ordenar perentoriamente la absolución del acusado. Allí el juez debe limitarse a recomendar la absolución. El jurado, sin embargo, puede actuar con entera libertad a pesar de la recomendación del juez. El artículo 257 de nuestro Código de Enjuiciamiento Criminal concede al juez la facultad de ordenar perentoriamente al jurado que absuelva al acusado. Si la misión del jurado es simplemente obedecer, hay que convenir en que sus funciones como cuerpo deliberativo quedan anuladas desde el momento en que se convierte en un mero ejecutor de la voluntad del juez. En estas condiciones, aunque el veredicto aparezca firmado por el jurado, la verdad es que la absolución quien la decreta es el juez.

El Juez Brown manifiesta su asombro, y hasta considera imposible suponer que fuera la intención del Congreso poner en manos de un solo juez la facultad grande y peligrosa de absolver definitivamente a los criminales más notorios. El espíritu de las instituciones americanas es amparar al inocente, no tender sobre el culpable el manto de la inmunidad. La teoría del *former jeopardy* tiene por objeto evitar que la prosecución se convierta en persecución; no impedir que el estado, por medios lícitos y legales, pueda continuar una causa hasta que sea definitivamente resuelta por los tribunales de apelación. Repetimos que el caso de Kepner v. U. S., supra, no es igual al que en estos momentos nos ocupa. La Corte Suprema de los Estados Unidos no ha resuelto que decretada una absolución por el jurado en virtud de un mandato perentorio de la corte, no pueda hacerse uso de un derecho de apelación concedido por la ley, para que en caso de que se haya cometido un error craso en contra de los derechos del estado, se ofrezca la oportunidad de subsanarlo mediante un nuevo juicio, como cuando se decreta la nulidad de una sentencia o veredicto a solicitud del propio acusado. En el caso de Kepner el juzgado de primera instancia decretó la absolución apreciando los hechos y aplicando el derecho; en el caso presente la prueba no pudo ser apreciada por los jueces de hecho llamados a dictar el veredicto.